**James A. CONDON, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 1411.

Supreme Court of Alaska.

June 16, 1972.

William H. Fuld, of Kay, Miller, Libbey, Kelly, Christie & Fuld, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Seaborn J. Buckalew, Dist. Atty., Robert L. Eastaugh, Asst. Dist. Atty., Anchorage, for appellee.

Before BONEY, C. J., and RABINOWITZ, CONNOR and ERWIN, JJ.

RABINOWITZ, Justice.

After trial by jury, James Condon was found guilty of the crime of second degree murder and was sentenced to 20 years. Condon now appeals both from the judgment of conviction and from the sentence that was imposed by the superior court.

In this appeal Condon advances three grounds for reversal of his conviction: first, that his motion for judgment of acquittal as to the charges of first and second degree murder should have been granted because the state's evidence was insufficient to go to the jury on these charges; second, that the trial court committed reversible error in admitting into evidence photographs of Condon's wife showing bruises she purportedly sustained in a beating administered by him and other evidence of particular wrongful acts committed by him towards his wife; and third, that he was denied effective assistance of counsel. Condon also appeals from the sentence imposed by the superior court on the ground that 20 years is an excessive sentence. We affirm Condon's conviction of the crime of second degree murder and further hold that the sentence imposed by the trial court was not excessive.

We turn first to Condon's contention that his motion for judgment of acquittal on the charges of first and second degree murder should have been granted. Our prior decisions have firmly established the standard of review this court will employ in passing upon such assertions of error. We have held that on an appeal from denial of a motion for judgment of acquittal, this court "must view the evidence and the inferences to be drawn therefrom in a light most favorable to the state." DeSacia v. State, 469 P.2d 369, 371 (Alaska 1970) (footnote omitted); Beavers v. State, 492 P.2d 88, 97 (Alaska 1971). Applying this standard to the record in the case at bar, we must determine whether "fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt [had] been established beyond a reasonable doubt." Bush v. State, 397 P.2d 616, 618 (Alaska 1964).

The record shows that Condon lived with his wife and daughter in one-half of a quonset hut in Bell Flats near the city of Kodiak. Isidor Cordova and Richard Barnes lived in the other half of the quonset hut. A nearby quonset hut was occupied by Timothy Peter Biehn, his pregnant wife, and two children.

On the morning of June 17, 1970, Condon accompanied Cordova and Barnes to Saltery Cove to try to get Barnes' truck out of the mud where it had become stuck. The three left at approximtaely 11 a. m. or noon and returned to the quonset hut occupied by Cordova, Barnes, and the Condons sometime between 2 and 3 p. m.

Mr. Biehn and Mrs. Condon were in the quonset hut when Condon, Cordova, and Barnes entered. Cordova and Biehn left almost immediately for Biehn's quonset hut, and Barnes left shortly thereafter. Barnes testified that he left his quonset hut to go over to the Biehn quonset hut because Condon was slapping his wife and Barnes did not want to get involved in a family argument.

At this point, the testimony of Cordova, Barnes, and Mrs. Biehn differs sharply from Condon's version of what transpired. Although there were minor discrepancies in the testimony of the three state witnesses, their testimony is substantially the same. Approximately 15 or 20 minutes after Barnes left his quonset hut, Condon walked towards the Biehn quonset hut carrying a pistol. Barnes testified that he was standing on the porch and saw Condon coming with his wife. He stated that Mrs. Condon had blood on her and her hair was messed up. Barnes asked Condon where he was going, and Condon looked at him and said, "Dick, he fucked my wife." Mrs. Biehn was also outside near the porch and Condon asked her if Pete Biehn was home. Mrs. Biehn replied that her husband was inside.

Cordova testified that after he and Biehn left the Condon quonset hut they went to the Biehn quonset hut where Mrs. Biehn was preparing supper. Biehn was lying face down on two or three cushions in the living room, playing with his children, drinking coffee and smoking a cigarette. Cordova was sitting next to him. Condon then entered the house crying and mad.

According to Cordova's testimony, Condon then

> pointed the gun towards Peter and it was just like you were hypnotized, you know, you just couldn't believe because it happened. He said, Pete, if you fuck around with my wife again I'll kill you and he fired a shot. . . . And about this time, Biehn stood up to get his rifle and made a motion and he—he touched it but [it] never left the rack. At this time another bullet fired and I thought at first he was hit in the shoulder because he threw the shoulder back, but he wasn't, I heard he was hit in the aorta.

After the second shot was fired, Cordova and Barnes struggled with Condon to get possession of the gun. During the struggle, the gun went off again. Barnes hit Condon on the head with a kerosene lamp, and eventually Condon released the gun. Cordova then went over to where Biehn had fallen. Biehn appeared to be unconscious. Cordova instructed Condon to go for help and instructed Barnes to go over to his quonset hut to hide the other guns that were there. Eventually the security police from the nearby naval station arrived in response to Condon's request. The state trooper arrived shortly thereafter. He determined that Biehn was dead. Condon was taken into custody.

Condon took the stand to testify in his own behalf. He testified that when he, Barnes, and Cordova returned from Saltery Cove, Biehn was in his part of the quonset hut with Mrs. Condon. After Barnes, Cordova, and Biehn had left the quonset hut, Condon noticed that his wife had a black eye that she did not have when he left for Saltery Cove. He asked her what had happened and she finally told him that Biehn had approached her sexually and when she denied him "he hit her in the eye and took advantage of her." Condon then told his wife that they were going over to Biehn's quonset hut to tell Biehn to stay away from the Condons. Mrs. Condon did not get ready as fast as Condon would have liked, so he testified that he became angry and slapped her. Condon took

a loaded .32 automatic pistol from next to his bed which

> I felt that I might need due to the fact of Mr. Biehn's temper, violent temper that I had heard about, and can get witnesses to testify about.

Condon testified that he followed Barnes, Cordova, and Biehn over to the Biehn's hut within two or three minutes. As he approached the quonset hut, Barnes and Mrs. Biehn were on the porch. Condon asked Mrs. Biehn where her husband was. Condon denied that he spoke to Barnes at that time. He testified that he stopped on the porch to take his shoes off as he did not want to muddy up the floor. He opened the door and took two or three steps into the quonset hut. His pistol was pointing at the floor. Condon stated:

> I said, Pete, and he immediately looked up and as soon as he saw me he rose and reached for a rifle on the gun rack.
>
> .   .   .   .   .   .
>
> I was just standing there.
>
> .   .   .   .   .   .
>
> . . . after I had said Pete and he was reaching for the rifle on the gun rack, I said don't and at that time I fired what—well, a warning shot into the wall which would have been to Mr. Biehn's right—the lower right of the gun rack.

Condon testified that after he fired the warning shot, Mrs. Biehn came in and gathered up her children and took them out of the room. During this time Biehn was putting a magazine into the rifle. Mrs. Biehn approached her husband and said, "Don't he's got a gun," and Biehn pushed Mrs. Biehn out of the way and started to turn toward him. At this point Condon testified he fired the fatal shot. Condon further testified that he believed himself to be in danger when Biehn swung around toward him with the rifle.

Viewing the evidence in the light most favorable to the state, we conclude that reasonable minds could differ on the question of whether Condon's guilt of first or second degree murder was established

beyond a reasonable doubt. Condon delayed approximately 20 minutes after learning that his wife had had sexual intercourse with Biehn before starting out for Biehn's quonset.[1] Condon took with him a loaded automatic pistol. Enroute to the fatal encounter he spoke to two persons. At the threshold of Biehn's quonset, Condon stopped to take off his wet and muddy shoes so he would not "muddy up" Biehn's floor. Once inside Biehn's residence, Condon spoke to Biehn, fired one shot, and then killed Biehn with a second shot. We think that the range of the reasonable inferences which could have been drawn from this evidence permitted the issues of Condon's premeditation and malice to go to the jury under the charges of first and second degree murder.

Condon next argues that certain questions asked of him by the prosecutor during cross-examination, together with certain photographs of his wife, were so prejudicial as to deprive him of a fair trial. In the course of his cross-examination of Condon, the prosecutor questioned Condon as follows:

Q As a matter of fact, Mr. Condon, isn't it true that what really happened was you went into your bedroom and saw some spots on your bed which caused you to be suspicious?

A No, sir.

Q Isn't that true, that's the first indication you had?

A No, sir.

Q And isn't it true that after that you came out and you demanded of your wife whether or not she had had intercourse and she denied it, isn't that true?

A No, sir.

Q And isn't it true, Mr. Condon, that from that time forward you beat her with a belt buckle, the hard end of a belt buckle and with your hands . . . .

Q . . . and with other objects until she admitted to you . . . .
[Objection. Overruled.]

Q All right. As a matter of fact, you hit her with the pistol, didn't you?

A No, sir.

The prosecutor then showed Condon a series of photographs which depicted Mrs. Condon with numerous bruises about her face and body. The photographs were admitted into evidence over objection on the ground that they were irrelevant and unduly prejudicial.

At another point in Condon's cross-examination, the following transpired:

Q And on still other times isn't it true you've determined that the best way to get along with this young girl [Mrs. Condon] is to beat her every once in awhile?

A No, sir.

Q . . . How old is your wife, now, Mr. Condon?
[Objection. Overruled.]

A She'll be 18 in December.

Q She was 13 when you were married in any event . . . .

Q Isn't it a fact that you made a special trip into Virginia in order to marry her, for 4 hours, so that you knew you couldn't—you couldn't marry this young child?

[Objection.]

THE COURT: Well, I'll—disregard it members of the jury. I'm not going

[1]. During this 20 minute period, Condon at the very least slapped his wife, if not striking her harder.

to allow that. I feel it's too remote to have any bearing on the case in question.

In regard to the foregoing, Condon argues that the prosecutor's questions as to whether on the day of the shooting he had hit his wife with a pistol or a belt buckle reflect that "[t]he District Attorney was trying the defendant for his conduct towards his wife, instead of murder." Condon does not specifically argue that this was improper because it was evidence of particular wrongful acts, nor does he discuss Civil Rule 43(g) (11) (b) which provides that a witness may be impeached by contradictory evidence.

This court has, in a number of cases, permitted impeachment by particular wrongful acts where the questioning was not protracted and where there was an independent legitimate purpose for such a line of questioning. McKay v. State, 489 P.2d 145, 148 (Alaska 1971); Whitton v. State, 479 P.2d 302, 316–317 (Alaska 1970); Smith v. State, 431 P.2d 507, 509 (Alaska 1967). These cases involved inquiry into particular wrongful acts which also tended to show that the witness was biased. In Condon's case, the inquiry in question was apparently designed to discount Condon's story that his wife had been beaten and taken advantage of by Peter Biehn. These same questions also were aimed at impeaching Condon's testimony to the effect that he only "backhanded" his wife

just prior to his fatal encounter with Biehn. Thus, this line of inquiry was within the evidentiary rule which permits impeachment by contradictory evidence.[2] We therefore hold that the trial court did not err in permitting these questions to be propounded to Condon on cross-examination.

Assuming the issue concerning the photographs is properly before us,[3] we hold that the trial judge did not err in allowing them into evidence. In Stevens v. State, 443 P.2d 600, 603 (Alaska 1968), cert. denied, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969), this court held

> a photograph is admissible in evidence in the discretion of the trial judge, as an aid to the court or jury, after it has been shown to be a faithful representation of whatever it purports to depict, provided it is relevant, and provided its evidentiary value is not outweighed by any prejudice it might create. (footnotes omitted)[4]

In our opinion the photographs were relevant and their evidentiary value outweighed any possible prejudice they might have created. Examination of the photographs shows that they were not lurid or inflammatory. On the other hand, they were supportive of the prosecutor's theory that it was Condon who beat his wife prior to the shooting. In this respect, we note Barnes testified that when he returned

2. Gafford v. State, 440 P.2d 405, 408 & n. 16 (Alaska 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969). There was no specific evidence in the record that Condon had used a pistol or a belt buckle to produce the bruises that his wife sustained. Apparently the prosecutor anticipated that Mrs. Condon would testify as to these matters, but on the claim of marital privilege by Condon, she was not permitted to testify. From our reading of the record, it seems reasonable to infer that the district attorney was acting in good faith in attempting to get Condon to admit that he did more than merely "backhand" his wife, and that the bruises sustained by Mrs. Condon were received from him rather than Peter Biehn.

3. Although the admission of the photographs into evidence was specified in Condon's Statement of Points on Appeal, this issue was not mentioned at all in the argument portion of his brief. In past decisions this court has refused to consider points that have been inadequately briefed. Lewis v. State, 469 P.2d 689, 691 & n. 2 (Alaska 1970); McIntyre v. State, 379 P.2d 615, 618 (Alaska 1963).

4. *Accord,* Sleziak v. State, 454 P.2d 252, 260–261 (Alaska), cert. denied, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969); Maze v. State, 425 P.2d 235, 239–240 (Alaska 1967); Watson v. State, 387 P.2d 289, 294 (Alaska 1963); McIntyre v. State, 379 P.2d 615, 617–618 (Alaska 1963).

from Saltery Cove, Mrs. Condon did not have bruises on her face and body.[5]

■ Condon bases his claim of denial of effective assistance of counsel on two separate themes. First, Condon argues that his trial counsel was appointed so close to the commencement of the trial that in a case involving a homicide charge this court must presume that he was denied effective assistance of counsel in the constitutional sense. Second, Condon asserts that he was denied effective assistance of counsel because his trial counsel failed to raise "the only just and obviously proper defense, . . . [that] of diminished responsibility or lack of capacity to commit murder." We will first consider Condon's contention that the closeness of his attorney's appointment to the time of trial denied him effective assistance of counsel. Resolution of this contention requires an examination of the events which preceded the trial, as well as an evaluation of the proceedings at trial.

Condon was arrested on June 17, 1970, the day of the shooting. On June 18, 1970, he was brought before a district court judge in Kodiak who advised Condon of his rights, including the right to be represented by appointed counsel if he could not afford to hire a private attorney. The court conducted an inquiry into Condon's financial status and apparently found that Condon was eligible for assistance from the Public Defender. The judge indicated that Herbert Soll of the Anchorage Public Defender's office had been contacted and that he would be coming to Kodiak for Condon's preliminary hearing. A preliminary hearing was conducted on June 22, 1970. Mr. Soll represented Condon at that hearing. Following the hearing, the judge found that there was probable cause to hold Condon on the charge of manslaughter.

Subsequently, a grand jury returned an indictment charging Condon with first de-

gree murder. Condon was thereafter arraigned in superior court on August 14, 1970, and was represented at the arraignment by the Public Defender Agency. On August 20, 1970, Condon entered a plea of not guilty. On September 15, 1970, the superior court ordered a psychiatric examination of Condon to determine whether or not he was mentally competent to stand trial and assist in his defense. On October 7, 1970, a hearing was held on the question of Condon's mental competency to stand trial. The transcript of this hearing contains the first indication in the record that Condon was having problems with his court appointed counsel. In light of this problem, the court set the hearing over for one week to give Condon an opportunity to straighten out his problems with counsel.

On October 14, 1970, the competency hearing was held. Victor Carlson of the Public Defender Agency represented Condon at this hearing. A psychiatrist testified that in his opinion Condon was not suffering from any major mental illness and was able to understand the nature of the charge against him. The witness further testified that Condon was able to assist counsel in his own defense. On the basis of this testimony, the court found that Condon was competent to stand trial. Condon then entered a plea of not guilty to the charge of first degree murder. The court stated that it wished to give priority to criminal cases in which the defendant was in custody and inquired of the public defender when he might be ready to go to trial. Mr. Soll, who was also present and who was to try the case, indicated that one week would be sufficient.

On October 29, 1970, a hearing was held on a motion to continue the trial because Condon had indicated that he no longer wished to be represented by the public defender. Condon told the superior court

5. With respect to the question regarding Mrs. Condon's age at the time she married Condon, Condon's counsel objected to the question and the court overruled the objection. .Assuming the question lacked relevance, the admission of this evidence was harmless error under the criteria of Love v. State, 457 P.2d 622 (Alaska 1969).

judge that there had been a great lack of communication between him and his attorney during the preceding two months. He also stated that with the exception of one day, he had not seen his attorney for as much as 15 minutes at a time. Condon stated that he wished to have another attorney appointed for him. The court then appointed James Johnston to represent Condon. In making the appointment, the court stated:

[Johnston has] advised me that he will drop everything and proceed to prepare. It will be necessary, of course, for him to confer with Mr. Soll because if the case is largely prepared, Mr. Johnston will have to discuss with Mr. Soll so that he can be brought up to date and be prepared to go to trial. I've indicated to Mr. Johnston and to the district attorney that it is my intention to bring this case on for trial on the 9th [of November] if Mr. Johnston can be ready.

Apparently Mr. Johnston indicated to the court that he was ready to proceed on November 9, 1970, for the trial began on that date. During the voir dire of the petit jury panel, the following exchange took place between Condon and the trial judge:

MR. CONDON: . . . It's my understanding that my attorney has approached you for a postponement or a continuance of my hearing and you have denied this. May I ask why?

THE COURT: I told Mr. Johnston to make every effort to get ready and if he could—that this included my intervention to allow Mr. Johnston to have access to the information in the district attorney's files. He has advised me that he is ready to proceed and under the circumstances we will proceed.

MR. CONDON: Well, Your Honor, as far as I am concerned, I have gained nothing by defending through this attorney, Mr. Johnston, and do care to dismiss him at this time and would like for the court, if it pleases the court, for the court to appoint me another attorney.

THE COURT: Well, I'm going to deny that application, Mr. Condon.

.    .    .    .    .    .

MR. CONDON: Another thing, I've not had the chance to properly discuss the case with this attorney. He went to Kodiak. He talked to witnesses and things of this sort. I asked him to take me with him. He did not do this. I asked him to talk to certain people up there. He did not. He's also an acquaintance with one of the state's witnesses against me, Isidor Cordova, who is a homosexual and it's my understanding that when he was up in Kodiak he talked with Mr. Cordova but not in regards to my case. He only spoke with the trooper and Mr. Barnes. He didn't attempt to locate my wife or any of the people in my behalf for defense in my behalf.

.    .    .    .    .    .

THE COURT: Just a minute. I've kept abreast of Mr. Johnston. I'm aware of what he's done. He's had access . . . to the information in the district attorney's files. I understand that's been made available, is this correct, Mr. Walters? At my request he's devoted his sole attention to preparing this case since the last time you appeared here and it was necessary to relieve the public defender's office and appoint Mr. Johnston.

.    .    .    .    .    .

THE COURT: I've asked Mr. Johnston, and he's assured me that he's given up everything else that he could in order to prepare for this case and he's ready this morning.

■    The question of whether there has been inadequate time to prepare a defense depends largely upon the circumstances of each case. United States ex rel. Mathis v. Rundle, 394 F.2d 748 (3rd Cir. 1968). Weight will be accorded to trial counsel's assertions that he had adequate time to prepare despite a relatively short period of time between appointment and trial. 394 F.2d at 753. In the instant case, the trial judge indicated that he wished to set the

trial approximately 10 days from the date he appointed Mr. Johnston, but further indicated that he would consider a request for additional time. Mr. Johnston stated that he was ready for trial and did not request additional time. Prior to trial, he consulted with witnesses in Kodiak, discussed the case with the public defender who for several months had represented Condon, and also discussed the case with Condon personally. Mr. Johnston talked the case over with the prosecutor and prior to trial examined the contents of the prosecutor's file. Following the trial, Mr. Johnston averred that he could not "think of anything he might have done, but did not do, which could have aided either the preparation or the trial of this matter." Our analysis of the record of the seven-day trial leads us to the conclusion that Johnston defended Condon vigorously and in a professional manner.[6] In light of the totality of these circumstances, we cannot conclude that Condon was denied effective assistance of counsel because his trial counsel was appointed 10 days prior to the actual commencement of the trial.[7]

6. We believe Condon's reliance on our decision in Klockenbrink v. State, 472 P.2d 958 (Alaska 1970), is misplaced. There the trial court denied a continuance which had been sought to enable defendants to be represented by counsel of their choice. We held that denial to be an abuse of discretion. In regard to *Klockenbrink's* applicability to the case at bar, we think it sufficient to note that there is a significant distinction between denial of counsel of one's choice and the denial of effective assistance of counsel appointed by the state or court. *See* Anderson v. State, 3 Md.App. 362, 239 A.2d 579 (1968).

7. Our holding is not to be construed as approving as a matter of general calendar practice the appointment of counsel and scheduling of a trial of a serious offense in such close proximity. All we hold in the instant case is that under the particular factual circumstances of this record we cannot find that the timing of the trial in relation to trial counsel's appointment denied Condon his constitutional right to the effective assistance of counsel in his defense.

■ This leads us to examination of the second facet of Condon's claim that he was denied effective assistance of counsel. Here Condon asserts that he received an inadequate defense because "the only just and obviously proper defense . . . was one of diminished responsibility or lack of capacity to commit murder." We have previously dealt with the question of whether due process rights were violated because the incompetence of counsel rendered ineffective the legal assistance guaranteed an accused in a criminal proceeding. In White v. State, 457 P.2d 650, 653 (Alaska 1969), we said:

The criterion employed is that if the conduct of counsel was so incompetent as to deprive his client of a trial in the genuine sense—making that trial a mockery and a farce—then the defendant is entitled to a new trial. . . .

The 'mockery and farce' test is a relatively stringent one. . . . [W]e must consider the entire proceedings and the whole record to decide whether counsel's conduct fell short of the mark. The

Doe v. State, 487 P.2d 47 (Alaska 1971), is distinguishable from the instant case. In *Doe*, we held that it was error to set an adjudication hearing only one day after the delinquency petition was filed. We further held that the trial court abused its discretion in allowing Doe only a two-day continuance, over a weekend, where the court was aware that Doe's counsel had to prepare another children's hearing that was to commence the same day as Doe's. Condon had notice of the charges against him and had been represented by the Public Defender Agency for some four months prior to Mr. Johnston's appointment. Mr. Johnston had the benefit of not only the public defender's file in Condon's case but the district attorney's file as well. Johnston indicated to the court that he was prepared for trial on November 9, 1970, while Doe's counsel insisted at the time of the adjudication hearing that he had not had sufficient time to prepare an adequate defense. Further, Mr. Johnston devoted all of his time to Condon's case between his appointment and the commencement of the trial.

only workable standard is to determine whether the proceedings as a whole have a judicial character. Particular errors or claimed errors of counsel are not enough. The proceedings must be so tainted that there was an absence of a genuine trial in any reasonable sense.[8] Subsequent to our decision in *White*, we had further occasion to elaborate upon the constitutional guarantees of effective assistance of counsel. In Dimmick v. State, 473 P.2d 616; 618 (Alaska 1970), Justice Dimond, in speaking for the court, wrote:

> The right to the effective assistance of counsel requires only that counsel be conscientious and diligent in assisting a defendant in having a genuine trial in a reasonable sense—a trial where the government is put to its burden of proving guilt beyond a reasonable doubt, in accordance with established principles of law and fundamental notions of fair play and substantial justice. (footnote omitted)

In this case our study of the whole record leaves us with the conviction that Condon received effective assistance of counsel in the constitutional sense. Through the conscientious and diligent efforts of his trial counsel, Condon was given the benefit of a genuine defensive effort in accordance with established notions of fair play and substantial justice. The entire trial was judicial in character and as such was the very antithesis of the "mockery and farce" standard.

More particularly, we hold that trial counsel's reliance on the defense of self defense was tactically justified.[9] The record reveals a sufficient evidentiary basis for a good faith assertion of the defense of self defense. On the other hand, it is not apparent from the facts appearing in this record that the defense of diminished capacity, or temporary insanity, could have reasonably been tendered.

The cases generally are in agreement that an attorney's choice of defense theory ordinarily will not be subject to a claim of denial of effective assistance of counsel. In People v. Fain, 70 Cal.2d 588, 75 Cal. Rptr. 633, 639, 451 P.2d 65, 71–72 (1969), the court said:

> Defendant next challenges the competency of his trial counsel. The very transparency of the alibi testimony, the defendant now asserts with the clarity of hindsight, indicates that an alibi defense should have been abandoned. Specifically, defendant charges that the defense should have been centered on diminished capacity, not alibi. It is noteworthy that defendant initially entered a plea of not guilty by reason of insanity; before trial, he withdrew the insanity plea in favor of a not guilty plea. Pretrial psychiatric reports, defendant concedes, revealed the possible presence of a diminished capacity defense. The fact that an insanity plea was entered suggests that a defense structured on . . [diminished capacity] did receive consideration, but counsel ultimately rejected dependence upon that defense. We cannot conjecture, of course, on the reason for this decision. In presenting the defense of alibi, counsel vigorously cross-examined prosecution witnesses, called witnesses on his client's behalf, put defendant on the stand to testify under oath concerning his alibi, and extensively summarized the defense in arguments to the jury. Defendant cannot now be heard to complain because his chosen defense was not successful and his sworn testimony disbelieved.

Also of significance is Pamanet v. State, 49 Wis.2d 501, 182 N.W.2d 459 (1971). There the defendant was convicted of caus-

---

8. *See also* Johnson v. State, 486 P.2d 379 (Alaska 1971); Thessen v. State, 454 P. 2d 341, 352 (Alaska 1969), cert. denied, 396 U.S. 1029, 90 S.Ct. 588, 24 L.Ed. 2d 525 (1970); Anderson v. State, 438 P.2d 228 (Alaska 1968).

9. Prior to trial counsel's appointment, the public defender had employed the theory of self defense at Condon's preliminary hearing.

ing great bodily harm to another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life. On appeal, defendant argued that he was denied effective assistance of counsel in that his trial counsel failed to make intoxication the principal defense, but instead relied on self defense. The court stated:

> Trial counsel tried the case on the theory of self-defense, electing not to dilute such defense with the claim of the high degree of intoxication necessary to negative the existence of a state of mind required by the offense. He was not required to do so. 182 N.W.2d at 466 (footnote omitted)

The facts in the record which Condon has asserted show a mental state that would have supported a defense of temporary insanity or diminished capacity are not of the order of the factual allegations presented to the court in Brubaker v. Dickson, 310 F.2d 30 (9th Cir. 1962).[10]

We also note that the prosecution's case against Condon was rather strong. Three eye-witnesses testified that Condon shot Biehn as Biehn was merely reaching for his rifle. Such circumstances are also relevant in determining whether Condon received effective assistance of counsel. The court stated in United States ex rel. Crispin v. Mancusi, 448 F.2d 233, 234 (2d Cir. 1971):

> In evaluating this contention [denial of effective assistance of counsel], we start by examining the strength of the prosecution's case. If that case is overwhelming, there may be little that defense counsel can do, and counsel will very likely be faulted by the dissatisfied client either for doing too much or too little.

In light of the foregoing, we hold that Condon was not denied effective assistance of counsel because his trial counsel did not raise the defense of diminished capacity or temporary insanity.[11]

10. In *Brubaker*, the petition for habeas corpus alleged numerous facts gathered primarily after the trial that indicated the existence of a diminished capacity defense. Electroencephalographic tests showed that the defendant had organic brain damage. Medical opinion indicated that the brain damage made the defendant prone to seizures of a type often associated with abnormal behavior. A psychiatric opinion based on post-trial examinations showed that the defendant was not insane, but had a compulsive personality marked by strong emotional instability. The record indicated that the defendant had been drinking heavily prior to the homicides and that he was hypersensitive to alcohol.

At trial, defense counsel called no witnesses as to either the defendant's mental state or any other matter. He did not consult with the defendant during the trial or between court sessions. Defense counsel argued that the defendant did not have the necessary intent for first degree murder, but relied only on the details of the physical evidence of the crime and of the defendant's confessions. During the penalty phase of the trial, counsel offered no evidence in mitigation of the penalty. Based on the post-trial allegations of organic brain damage, the court determined that substantial evidence in mitigation

was available and could have been secured by reasonable diligence. The *Brubaker* court stated:

> [Effective assistance of counsel] . . does not mean that trial counsel's every mistake in judgment, error in trial strategy, or misconception of law would deprive an accused of a constitutional right. . . . Determining whether the demands of due process were met in such a case as this requires a decision as to whether 'upon the whole course of the proceedings,' and in all the attending circumstances, there was a denial of fundamental fairness; it is inevitably a question of judgment and degree.
>
> . . . The defense actually tendered was so insubstantial in relation to those not offered as to cast doubt upon the hypothesis that trial counsel made a deliberate informed choice.

310 F.2d at 37–38 (footnotes omitted). The court held that the defendant's allegations, if true, precluded the presentation of his available defenses through no fault of his own, and thus rendered his trial fundamentally unfair; the court ordered a hearing on the petition in the district court.

11. *Compare* Mead v. State, 445 P.2d 229, 233 (Alaska 1968), cert. denied, 396 U.S.

One issue remains to be considered. Condon has also appealed the 20-year sentence he received upon his conviction of the crime of second degree murder. We do not agree with Condon that the sentence imposed is excessive. Under the standards first articulated in State v. Chaney, 477 P.2d 441, 444 (Alaska 1970), we are unable to conclude that the trial court was either clearly mistaken in imposing the 20-year sentence, or that such sentence was beyond the zone of reasonableness considering the gravity of the offense and Condon's background. We believe that the following portions of the trial court's comments made at the sentencing proceedings justify affirmance of the 20-year sentence imposed for second degree murder.[12]

In passing sentence upon Condon, the trial judge said in part:

The minimum sentence established by law is 15 years. The maximum sentence is of course up to life. . . . First as I understand there's one prior conviction of a violation of the dire [sic] act. I consider it under the circumstances here there was some provocation prior to the shooting of Mrs. Condon admitted sexual relationship with the deceased. Thereafter the defendant administered a beating to his wife, armed himself and went to the quonset hut occupied by the deceased and his family. I've reviewed the statements excluding the statement of the defendant and I've reviewed the psychiatric report. The conclusions of the psychiatrist are these: superficial charm, an absence of delusions, may be somewhat paranoid, shows little anxiety. The individual is unreliable, often will convince others of his reliability and then repeat the act. He is unusually untruthful but convinces others of his sincerity. So he lies convincingly, shows a lack of remorse or sha—shame about an act, often will brag about it. Often exhibits anti-social behavior, is inadequately motivated, main excuses are offered for failure, judgment is poor, fails to learn by experience. Often humanistic usually has a limited capacity to love others showing a strong self-love. Often shows the general poverty in sharing major cat—catastrophic situations involving others. has a specific loss of insight with little awareness of the trouble he causes others. Responds poorly in any personal relationship shows other interests and does not want to get too involved, often will get drunk and act out sexual attachments or casual, may be homosexual or heterosexual, often a job jumper, that is gets mad, blows up and quits. . . . I— I don't consider any statement or opinion by the arresting officer as being of any significance and I combine my—the facts and the conclusions upon which I draw for the purpose of sentencing to the psychiatric report, to the statements and what I've heard in the trial in this case. I think the conclusions of the psychiatrist are born out to a considerable degree. During the events that led to the shooting, 2 children and the wife of the deceased and Isidor [Cordova] were present. The manner in which the defendant conducted himself created an extreme danger to those persons as well as the object of his anger. . . . I take into consideration the seriousness of which— of the act itself. Homicide is always a matter of the utmost gravity. I have taken into consideration the provocation and have indicated the psychiatric report and the statements and the testimony

855, 90 S.Ct. 117, 24 L.Ed.2d 104 (1969), where in rejecting appellant's contention that he was denied effective assistance of counsel, we said:

But the state's evidence against appellant was of an overwhelming nature pointing to appellant's guilt, and we do not perceive anything that counsel might have done differently so that it could be said that his failure to do so resulted in appellant being deprived of a crucial defense. (footnote omitted)

12. The statutory minimum for second degree murder is 15 years' imprisonment. The maximum punishment is life imprisonment. AS 11.15.030.

given at the time of the trial. I believe in this instance that the deterrent factor has to be strongly considered, that taking these factors into consideration, it's my judgment that the defendant shall be sentenced to a period of 20 years in the penitentiary.

In light of the foregoing, we think that the trial court's sentence was appropriate and warrants affirmance.[13]

The judgment and sentence entered below are affirmed.

BOOCHEVER, J., not participating.

---

13. In the past we have affirmed sentences that called for lengthy periods of incarceration when the antisocial conduct involved death or great danger to the personal safety of others. *E. g.*, Bowie v. State, 494 P.2d 800 (Alaska 1972) (five years for attempted robbery); Gregory v. State, 492 P.2d 108 (Alaska 1971) (seven years with three suspended for manslaughter); Robinson v. State, 492 P.2d 106 (Alaska 1971) (ten years for robbery); Johnston v. State, 489 P.2d 134 (Alaska 1971) (eight years with three suspended for robbery); Gray v. State, 487 P.2d 680 (Alaska 1971) (life imprisonment for first degree murder).