Clay **FRUIT**, Appellant,

v.

John E. **SCHREINER**, Appellee.

The **EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES**, Appellant,

v.

John E. **SCHREINER**, Appellee.

Nos. 1526, 1546.

Supreme Court of Alaska.

Oct. 20, 1972.

Rehearing Denied to No. 1546
Nov. 3, 1972.

Arden E. Page, of Hughes, Thorsness, Lowe, Gantz & Clark, Anchorage, for appellant Fruit.

John M. Conway, of Atkinson, Conway, Young & Bell, Anchorage, for appellant Equitable Life Assur. Soc. of United States.

Lester W. Miller, Jr., of Kay, Miller & Libbey, John Anthony Smith, Anchorage, for appellee.

## OPINION

Before BONEY, C. J., and RABINO-WITZ, CONNOR and BOOCHEVER, JJ.

BOOCHEVER, Justice.

This case arises from a tragic accident in which the appellee, John Schreiner, was crushed between his parked automobile and the colliding vehicle owned and driven by the appellant, Clay Fruit. As a result of the accident, Schreiner's left leg was amputated and the muscle tissue of the right leg so destroyed as to leave him crippled and permanently disabled.

At the time of the accident, Fruit, a life insurance salesman, was attending a sales convention of his employer, Equitable Life Assurance Society (Equitable). The annual convention was being conducted at the resort location of Land's End near Homer on July 10–13, 1969. Sales employees of the company were required to attend the convention. After discussing with district managers the possibility of transporting the Anchorage insurance salesmen to the convention by bus, the agency manager decided that participants should travel by private transportation, and that they would be reimbursed a lump sum for their expenses. Clay Fruit chose to drive his own automobile, accompanied by his wife, another insurance agent and the wife and child of the latter.

Insurance experts from California and Washington were also invited as guests to the convention, and the Alaska salesmen were encouraged to mix freely with these guests to learn as much as possible about sales techniques during the three-day gathering. Scheduled events included business meetings during morning hours, evening dinners and at least two cocktail parties. District managers entertained their own sales personnel at other cocktail parties.

On the first evening of the convention, Thursday, July 10, 1969, the out-of-state

guests and the agency manager dined at the Waterfront Bar and Restaurant in downtown Homer, approximately five miles from the convention headquarters at Land's End. They were joined a few hours later by a number of sales agents, including Fruit, for drinks and socializing. At other times during the first two days of the convention, the participants made occasional visits in small groups to the Salty Dawg Bar located about a half mile from the convention center at Land's End.

A desk clerk at Land's End testified that loud and sometimes disorderly partying continued around the room of the agency manager and the adjoining porch and stairway until the early hours of the morning on Friday, July 11, 1969. One of the district managers testified that he complained about the noise to the agency manager.

A business meeting on Friday morning proceeded on schedule followed by a cocktail party and hors d'oeuvres in the room and adjoining spaces of the agency manager. Fruit went to the room of an out-of-state guest with whom he talked business and had drinks. Testimony indicates that by mid-afternoon Fruit was asleep on the floor. That evening, a scheduled cocktail party and seafood dinner on the beach proceeded without Fruit who was still asleep in a room adjacent to that of the out-of-state guest.

At some time between 10:00 and 11:30 p. m. following the seafood dinner other members of the group awoke Fruit who, accompanied by his wife and two couples, walked to the Salty Dawg Bar and returned shortly. The others were tired and went to bed but Fruit decided to go to Homer as he was under the impression that the out-of-state guests were at the Waterfront Bar and Restaurant. Fruit then drove his car to Homer but departed when he did not find any of his colleagues.

His return route to Land's End took him past the Salty Dawg Bar where Schreiner's automobile was disabled on or immediately off the side of the road opposite Fruit's lane. While the facts of the particular moment of the accident which occurred at approximately 2:00 a. m. on July 12, 1969, are unclear, it appears that Fruit applied his brakes and skidded across the dividing line of the highway, colliding with the front of Schreiner's car. The hood of Schreiner's automobile had been raised and Schreiner was standing in front of his car. The collision crushed his legs.

The subsequent amputation and crippling of Schreiner was exacerbated by a urinary disorder resulting from exploratory surgery necessitated by the accident. Schreiner sued Fruit and his employer, Equitable, for damages including pain and suffering, mental anguish, interference with normal activities, continuing medical expenses, loss of income and financial losses incurred from the forced sale of his home, a lot and securities. The jury found on special interrogatories that Fruit's negligence was the proximate cause of the accident; that he was acting within the course and scope of his employment for Equitable; that Equitable was directly negligent in planning and conducting the convention, which negligence was a proximate cause of the accident; and that Schreiner was not contributorily negligent.[1] The jury awarded damages of $635,000 against both defendants. Both moved for a judgment notwithstanding the verdict and presently appeal from the respective denials of the motions.

Equitable contends that the evidence was insufficient to establish that Fruit was acting within the course and scope of his employment at the time of the accident; that Equitable cannot be held directly liable for the manner in which it conducted the summer conference; and that Equitable did not receive a fair trial because the facts adduced by the plaintiff in support of its direct negligence claim "tainted the jury's consideration of respondeat superi-

---

1. The record has been supplemented to include the special interrogatories to the jury and its answers thereto.

or." In addition Equitable contends that the jury's verdict was excessive.

Fruit likewise questions the amount of damages and also contends that Schreiner was guilty of contributory negligence as a matter of law or in the alternative that the jury's verdict on this issue was clearly erroneous.[2]

# I

## SCHREINER'S CONTRIBUTORY NEGLIGENCE

■ The parties do not question the jury's finding that Fruit's negligence proximately caused the collision. Fruit contends, however, that the trial court should have granted his motion for judgment notwithstanding the verdict on the issue of contributory negligence.

The location of Schreiner's vehicle prior to the collision was in dispute. There was testimony that the vehicle was parked directly in front of the Salty Dawg Tavern off the traveled portion of the roadway. Other testimony and photographs of the accident scene indicated that the car was on the tavern side of the roadway. The hood of the vehicle was raised and Schreiner had been working on its engine immediately prior to the collision.

Alaska's Motor Vehicle Code, 13 AAC, section 104.111, in effect as of the date of the accident provided in part:

Stopping, standing, or parking outside of business or residence districts.

[a] No person shall stop, park, or leave standing any vehicle, whether at-

tended or unattended, upon the paved or main-traveled part of a highway.

[b] This section shall not apply to the driver of any vehicle which is disabled while on the paved or main-traveled portion of a highway in such a manner and to such an extent as it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position.

In Ferrell v. Baxter,[3] Justice Connor speaking for this court in his comprehensive analysis of the law applicable to violations of traffic regulations stated:

Therefore, before a plaintiff is entitled to an instruction defining the violation as negligence per se, he must first demonstrate that he is among the protected class and, second, that the injury was caused by a harm against which the law was designed to protect.

The regulation in question would appear to be for the protection of vehicles proceeding in their proper lane against encountering a *parked*\vehicle on the traveled part of the highway. There was no showing in the subject case that the driver of a vehicle, such as Fruit, who should have driven on the opposite side of the road from Schreiner's vehicle was among the class protected by the regulation in question or that the injury was caused by a harm against which the law was designed to protect.[4] Thus it is doubtful that Fruit was entitled to an instruction defining the violation as negligence per se. The court nevertheless fairly instructed the jury as to the regulation and its effect.[5] Based

---

2. Other specifications were filed, but not argued in the briefs of appellants. Accordingly we consider them to have been abandoned. Weaver v. O'Meara Motor Co., 452 P.2d 87, 93 (Alaska 1969).

3. 484 P.2d 250, 261 (Alaska 1971).

4. Fruit was not in Schreiner's lane while passing another vehicle or for some other justifiable reason.

5. Instruction 15 specified in part:
 STOPPING, STANDING, or PARKING OUTSIDE of BUSINESS or RESIDENCE DISTRICTS
 [a] No person shall stop, park or leave standing any vehicle, whether at-

502 P.2d—9½

tended or unattended, upon the paved or main-traveled part of a highway.
 [b] This section shall not apply to the driver of any vehicle which is disabled while on the paved or main traveled portion of a highway in such a manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position.

Instruction 17 was as follows:
 If you find from a preponderance of the evidence that any party violated any of the provisions of the law just read to you and that such violation proximately caused the accident in ques-

on the court's instructions the jury found that Schreiner was not contributorily negligent.

In reviewing the lower court's ruling on a motion for a judgment notwithstanding the verdict, this court has said that it will view the evidence in the light most favorable to the nonmoving party, and that the denial of such a motion will not be disturbed if fair-minded men in the exercise of reasonable judgment could differ as to the facts underlying the verdict.[6] If there is room for diversity of opinion, the question is one for the jury and their determination will not be disturbed on an appeal.[7]

As indicated above there was some testimony to the effect that Schreiner's vehicle was parked off the "main-traveled" portion of the highway. There was also testimony that the hood was raised and that Schreiner was engaged in repairing the vehicle.[8] One permissible inference from this testimony would be that it was impossible to avoid stopping and temporarily leaving the vehicle in its position, thus the exception of subsection (b) of the regulation would be applicable.

We conclude that when the evidence is viewed in the light most favorable to the nonmoving party, Schreiner, a jury question was presented on the issue of contributory negligence and we shall not disturb the jury's determination of that issue.

## II

## EQUITABLE'S LIABILITY UNDER THE DOCTRINE OF RESPONDEAT SUPERIOR

The jury found that Fruit was an employee acting within the course and scope of his employment for Equitable at the time and place of the accident. Under the doctrine of *respondeat superior* (which simply means "let the employer answer") Equitable would thus be liable for Fruit's acts of negligence despite lack of fault on Equitable's part.

tion, you are instructed that the opposing party has established a prima facie case that the party violating the provision of law was negligent. That is, if plaintiff has so established that defendant violated the provisions respecting driving on the right side of the roadway, or the basic speed law, or both, plaintiff has established that defendant was negligent. If defendant has so established that plaintiff violated the provision respecting stopping, standing or parking outside of business or residence districts, defendant has established a prima facie case that plaintiff was contributorily negligent. The prima facie case of negligence or contributory negligence is not conclusive. It may be overcome by other evidence showing that under all the circumstances surrounding the event in question the conduct of the party was excusable or justifiable.

To show that a violation of law was excusable or justifiable, so as to overcome this prima facie case of negligence, in the event that you find that a party violated any of the foregoing provisions of law, the party so violating such provision must convince you, the jury, that any such violation of law resulted from causes or things beyond the control of that party and that he was not negligent.

The fact that a person skidded and lost control of the vehicle, if this be a fact, is not, standing alone, such excuse or justification. The burden would be on such person to convince you that no negligent act or omission caused the skid.

The fact that a vehicle became disabled while on the paved or main traveled portion of a highway, if this be a fact, is not, standing alone, such excuse or justification. The burden would be on plaintiff to convince you that it was impossible to avoid stopping and temporarily leaving the disabled vehicle in such position.

If, in accordance with these instructions, you find that a party has violated the law and that any such violation proximately caused the accident in question, and you further find that such party has failed to so excuse or justify such violation of law, then you must find that that party was negligent (or contributorily negligent, as the case may be.)

6. City of Fairbanks v. Nesbett, 432 P.2d 607, 609–610 (Alaska 1967).

7. *Id.* at 610.

8. Schreiner suffered traumatic amnesia and could not relate the facts giving rise to the accident.

Equitable argues, however, that the evidence was insufficient to establish that Fruit was acting within the course and scope of his employment. Equitable contends that any business purpose was completed when Fruit left the Waterfront Bar and Restaurant. It cites cases holding that an employee traveling to his home or other personal destination cannot ordinarily be regarded as acting in the scope of his employment.[9] But Fruit was not returning to his home. He was traveling to the convention headquarters where he was attending meetings as a part of his employment.

In addition, Equitable seeks to narrow the scope of *respondeat superior* to those situations where the master has exercised control over the activities of employees. Disposition of this issue requires an analysis of the doctrine of *respondeat superior*, one of the few anomalies to the general tort doctrine of no liability without fault.

The origins of the principle whereby an employer may be held vicariously liable for the injuries wrought by his employee are in dispute. Justice Holmes traces the concept to Roman law while Wigmore finds it to be of Germanic origin. The doctrine emerged in English law in the 17th Century. Initially a master was held liable for those acts which he commanded or to which he expressly assented. This was expanded to include acts by implied command or authority and eventually to acts within the scope of employment. The modern theory evolved with the growth of England's industry and commerce.[10]

A truly imaginative variety of rationale have been advanced by courts and glossators in justification of this imposition of liability on employers. Among the suggestions are the employer's duty to hire and maintain a responsible staff of employees, to "control" the activities of his employees and thus to insist upon appropriate safety measures; the belief that the employer should pay for the inherent risks which result from hiring others to carry on his business; the observation that the employer most often has easier access to evidence of the facts surrounding the injury; and the metaphysical identification of the employer and employee as a single "persona" jointly liable for the injury which occurred in the context of the business.[11]

Baty more cynically states: "In hard fact, the reason for the employers' liability is the damages are taken from a deep pocket."[12]

The two theories which carry the greatest weight in contemporary legal thought are

9. Loos v. Boston Shoe Co., 123 Cal.App.2d 564, 266 P.2d 884 (1954); Balise v. Underwood, 71 Wash.2d 331, 428 P.2d 573 (1967); Elder v. Cisco Constr. Co., 52 Wash.2d 241, 324 P.2d 1082 (1958); *but see* Hinman v. Westinghouse Elec. Co., 2 Cal.3d 956, 88 Cal.Rptr. 188, 471 P.2d 988 (1970) where employer held liable for injuries suffered by plaintiff when hit by employee returning from work; and by analogy, Northern Corp. v. Saari, 409 P.2d 845 (Alaska 1966) holding that in a workmen's compensation case the death of an employee killed in an accident while returning to camp after visiting a nearby air-base arose out of and in the course of his employment.

10. 2 Harper & James, The Law of Torts § 26.2 (1956). *Compare* Holmes, Agency, 4 Harv.L.Rev. 345 (1891) *with* 2 F. Pollock & F. Maitland, The History of English Law, 528–534 (2d ed. 1898). *See also* Wigmore, Responsibility for Tortious Acts: Its History, 7 Harv.L.Rev. 315, 383, 441 (1894); Baty, Vicarious Liability, ch. 1 (1916); Smith, Frolic and Detour, 23 Col.L.Rev. 444 (1923). The present doctrine can be traced to Lord Holt in a series of cases: Turberville v. Stampe, 91 Eng.Rep. 1072 (K.B. 1697); Middleton v. Fowler, 91 Eng.Rep. 247 (K.B.1699); Jones v. Hart, 90 Eng. Rep. 1255 (K.B.1699); Lane v. Cotton, 88 Eng.Rep. 1458, 1467 (K.B.1701); Hern v. Nichols, 90 Eng.Rep. 1154 (K.B. 1709).

11. The various rationale and their proponents are discussed by Baty in Vicarious Liability (1916). *See generally*, 2 Harper & James, The Law of Torts 1366–1374 (1956); Smith, Frolic and Detour, 23 Col.L.Rev. 447, 452–456 (1923). For the origins of the "enterprise theory" of vicarious liability, *see* Laski, The Basis of Vicarious Liability, 26 Yale L.J. 105 (1916).

12. Baty, Vicarious Liability 11 (1916).

respectively, the "control" theory which finds liability whenever the act of the employee was committed with the implied authority, acquiescence or subsequent ratification of the employer, and the "enterprise" theory which finds liability whenever the enterprise of the employer would have benefited by the context of the act of the employee but for the unfortunate injury.[13]

■ Since we are dealing with vicarious liability, justification may not be found on theories involving the employer's personal fault such as his failure to exercise proper control over the activities of his employees or his failure to take proper precautions in firing or hiring them. Lack of care on the employer's part would subject him to direct liability without the necessity of involving *respondeat superior*.

■ The concept of vicarious liability is broad enough to include circumstances "where the master has been in no way at fault; where the work which the servant was employed to do was in no sense unlawful or violative of the plaintiff's rights; where there has been no delegation of a special duty; where the tortious conduct of the servant was neither commanded nor ratified; but nevertheless the master is made responsible."[14] This liability arises from the relationship of the enterprise to society rather than from a misfeasance on the part of the employer.

The aspect of the relationship most commonly advanced to delimit the theory is the "scope of employment" of the employee-tortfeasor.[15] While the factual determina-

tion generally is left to the jury,[16] many cases lying in the penumbras of "scope of employment" have produced confusing and contradictory legal results in the development of an otherwise worthy doctrine of law.[17] To assist in delineating the areas of tortious conduct imposing liability, it is helpful to consider what we believe to be the correct philosophical basis for the doctrine.

There was a time when the artisans, shopkeepers and master craftsmen could directly oversee the activities of their apprentices and journeymen. Small, isolated communities or feudal estates evinced a provincial sense of social interaction which ensured that many enterprises would conduct their businesses with a careful concern for the community of its patrons. But in the present day when hundreds of persons divide labors under the same corporate roof and produce a single product for market to an unidentified consumer, the communal spirit and shared commitment of enterprises from another age is sacrificed to other efficiencies. At the same time, the impersonal nature of such complex enterprises and their mechanization make third parties considerably more vulnerable to injury incidentally arising from the pursuit of the business. Business corporations are granted a personal identification in legal fiction to limit liability of the investors, but not to insulate the corporate entity itself from liability for the unfortunate consequences of its enterprise.

"Scope of employment" as a test for application of *respondeat superior* would be

13. *See* Laski, The Basis of Vicarious Liability, 26 Yale L.J. 105 (1916); Prosser, Law of Torts, 459 (4th Ed. 1971).

14. Smith, Frolic and Detour, 23 Col.L. Rev. 716, 717 (1923).

15. *See generally*, 2 Harper & James, The Law of Torts § 26.6 et seq. (1956); Prosser, Law of Torts §§ 69–70 (4th ed. 1971).

16. E. g., Gossett v. Simonson, 243 Or. 16, 411 P.2d 277, 280 (1966); Balise v. Underwood, 71 Wash.2d 331, 428 P.2d 573, 577 (1967). *See also* 6 Blashfield, Automobile Law and Practice § 253.95

(Lewis ed. 1966); 53 Am.Jur.2d, Master & Servant § 426, at 442 (1970).

17. *E. g.*, Prosser, Law of Torts § 70, at 460 (4th ed. 1971) notes that "[t]his highly indefinite phrase . . . is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility in decisions. It is obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not."

insufficient if it failed to encompass the duty of every enterprise to the social community which gives it life and contributes to its prosperity.

> The meaning of the legal sword of Damocles forged for [the enterprises'] penalization is rightly to be found, not in the particular relation they bear to their charge, but in the general relation to society into which their occupation brings them.[18]

The basis of *respondeat superior* has been correctly stated as "the desire to include in the costs of operation inevitable losses to third persons incident to carrying on an enterprise, and thus distribute the burden among those benefited by the enterprise".[19]

The desirability of the result is readily discernible when an employee obviously engaged in his employer's business causes injury to a third party as a result of the employee's negligence. Thus, if an employee is engaged in trucking merchandise for an employer and through negligence in driving injures a pedestrian, it appears more socially desirable for the employer, although faultless itself, to bear the loss than the individual harmed. Insurance is readily available for the employer so that the risk may be distributed among many like insureds paying premiums and the extra cost of doing business may be reflected in the price of the product.[20]

The principle has been recognized by every state in the enactment of workmen's compensation laws whereby employees may recover compensation for injuries arising out of and in the course of their employment without reference to negligence on the part of employers. The costs to the employers are distributed to the public in the price of the product.[21]

Indeed the concept whereby the enterprise bears the loss caused by it has been recently extended to cover any loss caused by a defect in a manufactured product even without fault of employees or employers.[22] The rule of *respondeat superior*, however, has not been extended to that length and is limited to requiring an enterprise to bear the loss incurred as a result of the employee's negligence. The acts of the employee need be so connected to his employment as to justify requiring that the employer bear that loss.[23]

Although not usually enunciated as a basis for liability, in essence the enterprise may be regarded as a unit for tort as opposed to contract liability purposes.[24] Employees' acts sufficiently connected with the enterprise are in effect considered as deeds of the enterprise itself. Where through negligence such acts cause injury to others it is appropriate that the enterprise bear the loss incurred.

Consistent with these considerations, it is apparent that no categorical statement can delimit the meaning of "scope of employment" once and for all times. Applicability of *respondeat superior* will depend primarily on the findings of fact in each case. In this particular case, Clay Fruit's employment contract required that he attend the sales conference. Each employee was left to his own resources for transportation, and many of the agents, including Fruit, chose to drive their own

18. Laski, The Basis of Vicarious Liability, 26 Yale L.J. 105, 113 (1916).

19. Smith, Frolic and Detour, 23 Col.L. Rev. 716, 718 (1923).

20. For an in depth discussion see Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499 (1961).

21. 1 A. Larsen, The Law of Workmen's Compensation § 1, at 1 (1971); Alaska Workmen's Compensation Act, AS 23.30.

22. Clary v. Fifth Avenue Chrysler Center, 454 P.2d 244 (Alaska 1969).

23. *See generally* W. L. Prosser, Law of Torts § 69, at 459 (4th ed. 1971).

24. An analogy to this unit concept may be found in ancient law whereby "a man was absolutely liable for the acts of his slave— . . . —and a householder was in all probability liable for what was done by free members of his household." Pollock & Maitland, The History of English Law, at 529. Mentioned *supra* at n. 10.

automobiles. By the admission of Equitable's agency manager, the scope of the conference included informal socializing as well as formal meetings. Social contact with the out-of-state guests was encouraged, and there is undisputed evidence that such associations were not limited to the conference headquarters at Land's End. Some agents, including Fruit, gathered with the guests in Homer the evening before the accident, and groups of agents and their wives visited the Salty Dawg on various occasions.

When Fruit left for the Waterfront Bar and Restaurant his principal purpose was to join the out-of-state guests. This testimony of his was further confirmed by the fact that once he discovered that they were not present at the Waterfront he departed immediately. Had he been engaged in a "frolic of his own" [25] it would appear likely that he would have remained there. There was evidence from which the jury could find that he was at least motivated in part by his desire to meet with the out-of-state guests and thus to benefit from their experience so as to improve his abilities as a salesman.

Because we find that fair-minded men in the exercise of reasonable judgment could differ as to whether Fruit's activities in returning from Homer to the convention headquarters were within the scope of his employment, we are not disposed to upset the jury's conclusion that liability for damages may be vicariously imputed to Equitable.

## III

## EQUITABLE'S DIRECT LIABILITY

■ In addition to finding that Equitable was liable for the negligence of its employee the jury by its answers to interrogatories held that Equitable itself was negligent in "its planning and conducting the summer conference, and that such negligence was a proximate cause of the accident."

To reach this conclusion the jury must have believed that the convention involved improper use of intoxicating beverages which proximately caused the collision. We have grave doubts as to whether the record would sustain a finding that the collision was due to intoxication. Although Fruit had apparently been drinking heavily prior to falling asleep on the afternoon of Friday, July 11, the evidence indicates that he went to bed and slept from 4:00 to 10:00 p. m. or later when he was awakened. He had little to drink between then and the time of the accident, approximately 2:00 a. m. on July 12. He walked to and from the Salty Dawg (one-half mile from Land's End) and appeared fresh and not to be intoxicated.

Moreover, the great weight of authority holds that the gratuitous provider of alcohol cannot be held liable to one injured by an intoxicated driver in the absence of other facts.[26] The rule has been applied to persons injured by intoxicated drivers who obtained liquor at company office parties [27] and at a company picnic.[28]

**25.** See discussion in Smith, Frolic and Detour, 23 Col.L.Rev. 444 (1923).

**26.** Cherbonnier v. Rafalovich, 88 F.Supp. 900, 12 Alaska 634 (D.Alaska 1950); Miller v. Owens-Illinois Glass Co., 48 Ill. App.2d 412, 199 N.E.2d 300 (1964); Behnke v. Pierson, 21 Mich.App. 219, 175 N.W.2d 303 (1970); LeGault v. Klebba, 7 Mich.App. 640, 152 N.W.2d 712 (1967); 75 A.L.R.2d 833. There were no company conducted cocktail parties after Fruit awakened at 10:00 p. m. on July 11 and the company did not pro-

vide him with any drinks between then and the time of the accident. The small lump sum expense allowance to cover costs of transportation cannot remotely be held to include drinks purchased by Fruit and his friends.

**27.** Behnke v. Pierson, 21 Mich.App. 219, 175 N.W.2d 303 (1970); Halvorson v. Birchfield Boiler, Inc., 76 Wash.2d 759, 458 P.2d 897 (1969).

**28.** Miller v. Owens-Illinois Glass Co., 48 Ill.App.2d 412, 199 N.E.2d 300 (1964).

Cases cited by Schreiner involve additional affirmative acts on the part of the defendant justifying imposition of liability, such as plying a minor with intoxicants at a company Christmas party and then placing him in a car so that he could drive home.[29]

There is no indication that Fruit's presence on the highway was the direct result of affirmative action by Equitable placing him there or ordering him to undertake the fateful trip. Equitable may have created the environment in which one so inclined might behave as Fruit did, but we cannot go so far as to hold, as a matter of law, that the necessary degree of causation exists for direct negligence.[30]

Even with the evidence viewed most favorably to the plaintiff, we find that it was insufficient to present a jury question on Equitable's direct liability.

## IV

## ADMISSION OF PREJUDICIAL EVIDENCE

■ Equitable contends that the issue of its direct liability should not have been presented to the jury and that evidence introduced in support of that theory[31] had an inflammatory effect on the jury's consideration of the *respondeat superior* theory. We have carefully checked the record for instances of such potentially damaging testimony and find that while objections were occasionally made as to the form of particular questions, neither defendant

ever objected on the grounds of the relevance or the particularly prejudicial effect of the testimony. Thus, if any error were involved, it was waived.[32] Moreover, most of the evidence was relevant on the issue of *respondeat superior* as indicating the connection between Fruit's activities and the enterprise conducted by Equitable.

Equitable contends that if the court had granted its motion for a directed verdict on the issue of Equitable's direct liability, the court would have been in a position to instruct the jury to disregard some of the previously admitted evidence. We do not believe that the court could adequately specify the evidence to be disregarded; and the likelihood of a jury being able to so departmentalize its consideration of the issues would not warrant such an effort. Indeed, the attempt might well have emphasized the testimony sought to be disregarded.

■ In addition, Fruit contends that the admission of photographs of Schreiner's legs immediately prior to surgery and of a movie depicting portions of a day in the life of Schreiner was so prejudicial as to constitute clear error. We have viewed the exhibits in question and do not find that the trial court abused its discretion in determining that they were not prejudicial. Particularly in view of the lack of objection to their introduction into evidence,[33] we find no merit to the contention that admissibility of the evidence constituted reversible error.[34]

---

29. Brockett v. Kitchen Boyd Motor Co., 264 Cal.App.2d 69, 70 Cal.Rptr. 136 (1968). *See also* Friday v. United States, 239 F.2d 701 (9th Cir. 1957) (liability imposed for requiring employee to drive while fatigued).

30. Since, however, we have upheld the denial of the motion for judgment notwithstanding the verdict based on Equitable's vicarious liability, no reversible error is involved unless the decision as to direct liability in some way materially affected the eventual verdict. This is discussed in the remaining sections of this opinion.

31. Equitable refers to evidence of drinking, wild partying and boisterous conduct not only at the Land's End conference but at other Equitable functions.

32. Ahlstrom v. Cummings, 388 P.2d 261, 262 (Alaska 1964); Thomson v. Wheeler Constr. Co., 385 P.2d 111, 115 (Alaska 1963).

33. *Supra* n. 32.

34. Condon v. State, 498 P.2d 276, 281 (Alaska 1972); Sleziak v. State, 454 P.2d 252, 260–261 (Alaska 1969), cert. denied, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969); Stevens v. State,

## V

## AMOUNT OF DAMAGES AWARDED

Both Fruit and Equitable alleged that the damages awarded were excessive. This issue was first raised on defendants' motions for judgment notwithstanding the verdict. In denying defendants' motions the court gave a detailed discussion of the evidence which the jury might have considered in awarding substantial general damages, concluding by stating:

Now, as I say, admittedly the verdict was high but considering all of the evidence as to the gravity of plaintiff's injuries the necessity of his maintaining virtually a full-time therapeutic life style for himself from here to the remainder of his days I cannot find that the verdict is this proportinate [sic] to the injuries to such a degree that I·will have to set it aside
. . . .

 Initially we are required to determine whether we have appellate jurisdiction to review the trial court's denial of the motions in view of Alaska's constitutional provision preserving the right of trial by jury as it existed at common law,[35] and the similar provision of the seventh amendment to the United States Constitution. We agree with the unanimous holdings of the United States Circuit Courts of Appeals that nothing in the seventh amendment precludes appellate review of the trial judges' rulings on motions to set aside awards.[36] We construe the Alaska constitutional provision in the same manner as not prohibiting such review.[37]

 Our appellate jurisdiction in such matters, however, is greatly curtailed:

We have held that the granting or refusing of a request for a new trial is discretionary with the trial judge. We do not interfere in the exercise of that discretion except in the most exceptional circumstances and to prevent a miscarriage of justice. *In order for us to hold that the trial judge has abused his discretion, we would have to be left with the definite and firm conviction on the whole record that the judge made a mistake in refusing to order a remittitur or grant a new trial in response to appellant's motion.* [Emphasis supplied.][38]

In the subject case damages totaled $635,-000, admittedly a large amount. Schreiner at the time of the trial was 64 years of age and had a statistical life expectancy of 13.5 years. He came from a very long lived family, however,[39] and the jury could well have considered that his life expectancy would have been considerably longer than that of the average individual. The evidence indicated that he had suffered a great deal of physical pain and mental anguish, and that he will continue to suffer in the future. His life pattern has been reduced to maintaining his present physical condition whereby he is able to move about extremely slowly and with great care. According to the evidence presented, he will require a male attendant for the balance of his life to assist him in performing his daily functions.

443 P.2d 600, 603 (Alaska 1968), cert. denied, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969); Maze v. State, 425 P.2d 235, 239 (Alaska 1967); Watson v. State, 387 P.2d 289, 294 (Alaska 1963); McIntyre v. State, 379 P.2d 615, 617–618, 8 A.L.R.3d 1231 (Alaska 1963).

35. Alaska Const. art. I, § 16.

36. See n. 3. Grunenthal v. Long Island R.R., 393 U.S. 156, 157, 89 S.Ct. 331, 21 L.Ed.2d 309, 312, n. 3 (1968) for cases from all 11 courts of appeal.

37. In Hash v. Hogan, 453 P.2d 468 (Alaska 1969) and National Bank of Alaska v.

McHugh, 416 P.2d 239 (Alaska 1966), we reviewed trial courts' decisions pertaining to jury awards.

38. National Bank of Alaska v. McHugh, *supra* at 244. *See also* Dagnello v. Long Island R.R., 289 F.2d 797, 806 (2d Cir. 1961), quoted in Grunenthal v. Long Island R.R., *supra*, 393 U.S. at 159, 89 S. Ct. 331. Our standard for reviewing a court's denial of a motion for judgment notwithstanding a verdict is set forth in Fairbanks v. Nesbett, Alaska, 432 P.2d 607, 609–610.

39. Schreiner's father lived to the age of 94 and his mother to the age of 87.

The evidence further indicated that prior to his injuries Schreiner had been a very active man. He had been employed as a carpenter earning approximately $10,000 per year, and had he not been injured would have continued to work for a number of years. He liked to hunt, fish and enjoyed other outdoor activities. He has been foreclosed from pursuing normal pleasures for the balance of his life.

Evidence was presented with reference to special damages, including doctors' and hospital bills and loss of wages to the date of trial, future wage loss, orthopedic costs and the costs of the male aid, totaling $311,659. Included in these items were damages alleged to be attributable to forced sales, due to the necessity of securing funds because of his injuries, of the Schreiner residence, a lot and some stock. The evidence with reference to these items of special damages totaling $18,500 was sketchy. No objection was made, however, to the court's instructions pertaining to those items of damages, and since the jury awarded a lump sum for both special and general damages, it is impossible to ascertain whether those items totaling $18,500 were included in the amount of the jury verdict. Counsel likewise argued that past wage losses for the two-year period prior to the trial amounted to $20,000 and the defendants on appeal contend that this amount should have been reduced by the amount of the income taxes that would have had to have been paid on those earnings.[40] The court, however, expressly instructed the jury that the amount to be awarded for wage loss to the date of trial was to be paid after tax deductions.[41] Assuming that the income tax would have amounted to $6,000, and further reducing special damages by the questionable items referred to above totaling $18,500, the remaining items of special damages amount to $287,159. This would leave $348,841 to be awarded for general damages. As indicated above, at the time of the trial Schreiner had a statistical life expectancy of 13.5 years. In view of the longevity of his family, this could have been logically increased by the jury. We are thus confronted with the question of whether general damages of approximately $348,841 for this grievously injured 64-year old man are so large as to reflect an abuse of discretion by the trial judge.

In ascertaining whether damages awarded by a judge without a jury were excessive so as to require a remittitur or new trial on the damage issues, we have stated that "[w]e shall not set aside an award on a claim of excessiveness unless it is so large as to strike us that it is manifestly unjust, such as being the result of passion or prejudice or a disregard of the evidence or rules of law."[42] This same standard should be applied by a trial court in determining whether a jury's verdict is excessive. In view of the pitiful condition to which Schreiner has been relegated as a result of his injuries, we cannot find that the trial court abused its discretion in concluding that the award was not excessive.[43]

The judgment below is affirmed.

ERWIN, J., not participating.

40. Beaulieu v. Elliott, 434 P.2d 665, 672–673 (Alaska 1967).

41. Instruction No. 21 specified in part: "Loss of past wages will be computed with reasonable deduction for state and federal taxes . . . . "

42. Beaulieu v. Elliott, 434 P.2d 665, 676 (Alaska 1967).

43. All parties to this appeal have cited cases involving substantial awards. The defendants' citations are of cases where awards were reduced or involved amounts substantially under Schreiner's judgment, while plaintiff cites cases involving similar or larger awards. Since none of the cases present an exactly parallel factual situation and all involve substantial differences in time of injury and locale with resulting different economic factors, and laws relative to damages, we find little assistance in such cases. We do note that awards more substantial than Schreiner's have been upheld under somewhat similar circumstances. Brinegar v. San Ore Constr. Co., 302 F.Supp. 630 (D.C.Ark.1969); Mickle v. Blackmon, 252 S.C. 202, 166 S.E.2d 173 (1969); Parker v. Portland General Elec. (Cir. Ct. of Ore., May 29, 1970) (jury verdict).

**146**

## OPINION

### ON PETITION FOR REHEARING TO NO. 1546

Equitable Life Assurance Society of the United States (Equitable) has petitioned for a rehearing contending that the case should be remanded to the trial court for a new trial or a hearing on the issue of whether a new trial should be held, based on our overlooking or misconceiving a material fact or question in the case.

Equitable has previously argued that the consideration of the direct negligence issue permitted prejudicial evidence to go to the jury adversely affecting its decision on the *respondeat superior* issue. At one point in our opinion, we stated: "We have carefully checked the record for instances of such potentially damaging testimony and find that while objections were occasionally made as to the form of particular questions, neither defendant ever objected on the ground of the relevance or the particularly prejudicial effect of the testimony".

Equitable points out that at one point, counsel objected to the introduction of evidence pertaining to other sales campaigns conducted by it, the objections in part resting on the grounds of relevance. The testimony to which objection was made merely related to the fact that at the conclusion of the campaigns there were "wind up" parties during which alcoholic beverages were served. Such testimony had already been introduced prior to the objection in question and the testimony on the subject gave no indication of "wild partying" and excessive drinking so as to justify a contention of prejudicially affecting the jury's decision. It was the details of the partying at Land's End to which the court was principally referring in its opinion rather than the somewhat innocuous testimony pertaining to sales campaigns. Accordingly, we find no reason to reconsider our holding on this point.

Counsel has also suggested that we delete the final paragraph of the opinion wherein we refer to the *Beaulieu*[1] case, for the reason that reference thereto "was made only in petitioner's Statement of Points on Appeal; no contention was otherwise made in the proceedings below or on appeal that *Beaulieu* should be reversed." Since it is apparent that this point on appeal was abandoned, we agree that the paragraph in question may be striken.

Therefore, the petition for rehearing is denied.

---

1. Beaulieu v. Elliott, 434 P.2d 665 (Alaska 1967).