Larry Robert WILLIAMS, Appellant,

v.

ALYESKA PIPELINE SERVICE COMPA-NY, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 798 and William Reinhardt, Appellees.

No. 5130.

Supreme Court of Alaska.

Sept. 3, 1982.

L. Ames Luce, Kelly & Luce, Anchorage, for appellant.

Michael W. Price and David A. Devine, Groh, Eggers, Robinson, Price & Johnson, Anchorage, for appellee Alyeska.

Charles E. Cole and Stephan Williams, Fairbanks, for appellee Local 798.

Before RABINOWITZ, C.J., CONNOR, MATTHEWS and COMPTON, JJ., and HODGES, Superior Court Judge.*

## OPINION

MATTHEWS, Justice.

On August 24, 1975, at a pipeline construction camp, Larry Robert Williams was beaten by a group of men belonging to the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 798. He brought suit against, among others, William Reinhardt who was the Local 798 shop steward, Local 798, and Alyeska Pipeline Service Company [Alyeska]. Reinhardt did not answer the complaint and did not appear at trial either personally or through counsel. Following a trial against the other defendants, the court found that Reinhardt had no role in causing the attack and that neither Local 798 nor Alyeska was legally responsible for the attack. For the reasons set forth below, we reverse the court's decision concerning Local 798 and affirm as to Alyeska.

* Hodges, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

## I. FACTS

Williams was employed during August of 1975 as a bus driver by M–K River Corporation, a subcontractor of Alyeska. He was one of several Teamster shop stewards stationed at Alyeska's Tonsina Camp, near Glennallen. One of his duties was to drive the shuttle bus between the Tonsina Camp and Tonsina Lodge, a bar and liquor store.

On August 23, the night before the assault which gave rise to this suit, Williams was making his last trip of the evening back to camp. It was eleven o'clock on a Saturday night and most of the workers on the bus were drunk. A loud argument developed between three young welders belonging to Local 798, and a laborer. The dispute was apparently over which trade had made the greatest contribution to the pipeline project. Fearing that a fight was imminent, Williams pulled over at two or three points and threatened to stop the bus if the men did not settle down. He was able to complete the run, however, without any fights taking place.

At the camp all the passengers left the bus. From the driver's seat Williams heard the argument continuing between the welders and the laborer. Anticipating a fight, Williams got off the bus and "tried to intercede, tried to tell them this is crazy, not to get in a fight, . . . it didn't mean anything, . . . everybody was drunk." In the ensuing scuffle Williams inadvertently tore a tee-shirt worn by one of the welders which bore the 798 insignia. Incensed, the man broke the bottom off a beer bottle and approached Williams, demanding that he pay for the shirt. His companions restrained him and the three welders then left.

Williams was upset over the incident. That evening and during the next day he discussed it with several other men in the camp, including his immediate supervisor, the welders' foreman, and a fellow Teamster foreman. These men all reassured Wil-

liams and told him not to worry. Williams did not, however, report the incident to any Alyeska officials or to the camp security guards.

Williams also expressed his concern that evening to Ed Badger, a friend who belonged to Local 798. During his conversation with Badger, the three 798 members involved in the fracas approached and again demanded payment for the shirt. Williams said nothing while Badger told his fellow welders that if they wanted to fight they would have to fight him first. The three men then departed. The next morning, Badger spoke with Williams again, told him that he had been threatened by members of his union and was in fear for his life; he then left the camp and his job.

About mid-afternoon of the 24th Williams approached defendant William Reinhardt, who was the 798 shop steward at Tonsina, and a member of the union's four man executive board. He attempted to explain the incident and express his concern. According to Williams, Reinhardt responded by asking whether Williams was the one who had torn the welder's shirt. "I said yes and he says you'd better pay for that shirt or else, and turned around and walked off."

Williams made his first run of the evening without incident, returning to camp at about 6:45 p.m. While waiting to make his next scheduled run at 7:30 he went to the dining hall. During his meal, he heard over the camp public address system an order from Reinhardt that all 798 members were to meet at the shuttle bus parking lot. Williams decided not to make his run because he suspected that the union meeting concerned him. Along with two other teamsters Williams left the dining hall to see what was happening. They witnessed 798 members congregating in the bus pick-up area. Williams estimated that between 40 to 60 welders gathered and began walking together, toward him. He testified that Reinhardt was "leading the group, in the center leading the group towards me."

Upon reaching Williams, the welders pushed his fellow teamsters away and gathered in a semi-circle around him. His back was against the wall of the boardwalk outside the dining hall. According to Williams, Reinhardt first turned to the welder whose shirt had been torn and asked if Williams was responsible. He then turned to Williams and said, "You're going to have to pay for this shirt—you're going to have to pay him—this man $100.00 for this shirt and apologize right now." Williams refused. Reinhardt then stepped back and another welder stepped forward, repeated the demand, and began counting off the 15 seconds that he had given Williams in which to reconsider. When he still refused to pay the $100.00, one of the crowd struck Williams on the side of the face, causing his glasses to fly off. Several other welders began to beat him and he fell to the ground as the beating continued. On his hands and knees, Williams made his way through the crowd, struggled to his feet and ran away.

A somewhat different perspective of the incident can be pieced together from testimony by Michael Newman, a security guard employed by Alyeska's security system, Wackenhut of Alaska, and that of William Barram, Alyeska's camp operations supervisor.[1] Newman testified that just prior to the start of his 6 p.m. shift he overheard some workmen talking secretively about trouble that was brewing, similar to the earlier "mess hall incident."[2] Newman reported this information to his superior, Sergeant Welby, and to Barram, who instructed him to change into plain clothes and patrol the camp attempting to learn more. Barram also told the communications operator in the office to secure an open telephone line to the state trooper barracks, 40 miles away, in Glennallen.

Barram testified that the communications operator needed him to approve Reinhardt's

1. As camp operations supervisor Barram was Alyeska's highest ranking official at Tonsina Camp on the day of the assault. Mr. Charles Henry, the resident camp manager, was away at the time.

2. Apparently some of the camp residents had gone on a destructive rampage in the mess hall several months earlier.

announcement that all Local 798 members were to convene in the shuttle bus area. After speaking with Newman he approved the announcement, not yet fully aware of the connection between Newman's intelligence report and the 798 meeting.

While Newman was patrolling, Local 798 was convening, and Williams was waiting, Barram went to the mess hall. On the way, he stopped to chat with Williams on the boardwalk. Inside the mess hall, Barram heard Reinhardt's announcement and began to connect Williams' absence from the bus area with the 798 meeting and Newman's report of trouble. He returned to where Williams was standing and, as the angry welders approached, gave him authority not to make his bus run and advised him to leave forthwith. Barram then returned to his office.

On the way he saw "the group of men coming up the hallway led by Bill Reinhardt." Barram testified that Reinhardt's presence "alleviated any pressure in my mind that there was going to be anything happen[ing] of any nature." Back at the office Barram was so reassured that he cancelled the order to secure a line to the troopers. As it turned out, his reassurance was unwarranted. Newman testified that he saw between 25 and 40 welders surround Williams, who was about 15 feet away from him. "They made a demand of Mr. Williams that he give a public apology, pay . . . $100.00 for damages to a tee-shirt." When asked whether he could identify who made the demand Newman stated, "Well, there were several. The fellow that subsequently came to my attention was named Duvelle... Another individual who subsequently came to my attention was Jackie Lee, I believe was his name." Newman could not recall at trial whether or not Reinhardt was a member of the immediate group surrounding Williams.

Newman further stated that Williams agreed to apologize and even to pay the true value of the shirt, but would not pay the $100.00. Five or six men then began to beat Williams, who went down almost immediately. As Newman pushed through the crowd toward Williams, Mr. Lee pushed him in the chest. "His statement was, and he was right in my face, he said, 'we'll teach people not to . . . with 798'ers.'" Upon reaching the center of the fray, Newman pulled off the man who was holding Williams while the others hit him, and helped Williams to his feet.

Newman then suggested to the mob of welders that a one-on-one contest would be more sporting. "[W]hen I spoke, I spoke to the group and I received group consent and agreement . . . [t]o cooperate as far as having a one-on-one situation . . . The entire group agreed and then the nuclear group that were actually working with the assault took that over upon themselves to select who was going to do it, and they did it democratically by asking Mr. Williams, of course." A dazed, slumping Williams failed to make a selection from the assemblage. At that point Newman ran into his office to report what was happening and as he returned, one of the assailants, Duvelle, recommenced the battering. Williams fell to his hands and knees before Newman was able to get him to the edge of the crowd, up on his feet and moving away from the welders. The state troopers arrived about 30 minutes later.

Neither Reinhardt, nor any other member of Local 798 who witnessed the beating or the events leading up to it testified.

According to Williams, the beating resulted in a dislocated shoulder, hematomas of the left eye and lip, and substantial contusions and abrasions over much of his body. The shoulder dislocation required surgery and prevented Williams from working until March of 1976, six months later. He was adjudged to have a bodily impairment of 12.5% and because of this was unable to qualify for another high paying remote work assignment.

## II. REINHARDT'S ROLE IN THE ATTACK

The court below found that William Reinhardt was attempting to peaceably resolve

the dispute over the torn shirt.[3] Finding conflict in the testimony, the judge stated that he reached that conclusion based on security guard Newman's account of the incident.[4] Williams contends that there was no true conflict between his testimony and Newman's, and that the court erred in finding that Reinhardt was attempting to calm things down in order to avoid violence.

■ Findings of fact made at trial may not be set aside on appeal unless they are clearly erroneous.[5] A finding may not be set aside as clearly erroneous unless the reviewing court has a definite and firm conviction that a mistake has been made.[6] We hold such a conviction in this case.

No one testified to anything that Reinhardt said or did that suggested an attempt to calm things down. Williams testified that Reinhardt led the group and made a demand for $100.00 for the torn tee-shirt

and an apology. Barram specifically testified that Reinhardt was leading the group,[7] and although Barram stated that Reinhardt's presence reassured him he did not mention any action on Reinhardt's part, aside from his mere presence, that could have created that reaction. Newman did not dispute the fact that Reinhardt was at the front of the approaching group, but merely stated that he did "[not] recall Reinhardt being right next to Mr. Williams" during the confrontation. On cross-examination he testified that at one point he thought he had seen Reinhardt in the group that surrounded Williams, but did not recall whether that was accurate. At another point he testified that Reinhardt did not beat Williams; he did not testify to any peacemaking efforts by Reinhardt.

The court's finding that Reinhardt was a peacemaker is supported only by Barram's

3. Paragraph eight of the court's written findings of fact and conclusions of law states:
William Reinhardt was in the group as it moved toward Plaintiff. At that time, William Reinhardt was not leading the group toward Plaintiff with the intent to assault Plaintiff or to make extortious [sic] demands on him; rather his intent was to calm the feelings among several of the members of the group against Plaintiff ... William Reinhardt was then attempting to control the situation to prevent the outbreak of violence against the Plaintiff.
Paragraph nine states:
William Reinhardt did not make extortious [sic] demands upon Plaintiff as the group surrounded Plaintiff in front of the mess hall. Defendant Newman was standing nearby at the time and heard and saw the events which transpired immediately prior to the assault. He also observed the initial assault upon Plaintiff. His testimony of those events is more credible than those of Plaintiff and when his testimony relating to those events conflicts with the testimony of Plaintiff, the testimony of Newman is more credible and is adopted as fact.

4. In his oral decision the trial judge explained his underlying rationale:
[T]he evidence is in conflict and it tends to reasonably support the inference that he was in fact attempting to control the situation and avoid the confrontation. I find this from not only the general description of what occurred, but as to the conflict in the testimony just as to what portion or part Mr. William Reinhardt did play in the moments just before the beating commenced and what if any-

thing he did say. There's direct conflict between the testimony of the plaintiff and the testimony of the security guard Newman and taking into account the interest of the plaintiff and the undoubted trauma that the affairs of that moment worked on him ... and his recollection ... I think that there is good reason to believe that the testimony of Newman is more credible.

5. Civil Rule 52(a) provides in relevant part:
In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses....

6. *Martens v. Metzgar,* 591 P.2d 541, 544 (Alaska 1979); *Frontier Saloon, Inc. v. Short,* 557 P.2d 779, 781 (Alaska 1976).

7. Barram, the ranking Alyeska official at Tonsina Camp, testified that he saw "the group of men coming up the hallway led by Bill Reinhardt—Bill Reinhardt, right." Reinhardt's presence "alleviated any pressure in my mind that there was going to be anything happen[ing] of any nature because of ... the fact that he is a steward and ... Bob Williams being a steward." Moments earlier, however, he had testified that the sight of the approaching group had prompted him to give Williams authorization not to make his bus run and to leave camp.

"reassurance." The evidence to the contrary is overwhelming. Prior to the attack Williams approached Reinhardt to discuss the torn shirt, but was rebuffed with an ultimatum to pay for the tee shirt, "or else." Reinhardt called a meeting of the union members. He did not seek to assemble only those individuals who had been involved with Williams the night before, a logical step if conciliation rather than intimidation had been his purpose. The meeting was held at the bus loading area for a time when Williams was expected to be present. Again, if Reinhardt's purpose was to discourage a confrontation the meeting would have been called for a different time and place. When Williams did not appear at the meeting site Reinhardt led his men to Williams. When Reinhardt and the other 798 members reached Williams, there is no dispute that there were no conciliatory statements made. Instead, $100.00 was demanded from Williams as payment for the torn shirt under threat of a mob attack.

■ One who acts in concert with others to plan or assist in the commission of a tort is liable as a tortfeasor. As Prosser states:

> The original meaning of a "joint tort" was that of vicarious liability for concerted action. All persons who acted in concert to commit a trespass, in pursuance of a common design, were held liable for the entire result. In such a case there was a common purpose, with mutual aid in carrying it out; in short, there was a joint enterprise, so that "all coming to do an unlawful act, and of one party, the act of one is the act of all of the same party being present." Each was therefore liable for the entire damage done, although one might have battered the plaintiff, while another imprisoned him, and a third

stole his silver buttons. All might be joined as defendants in the same action at law, and since each was liable for all, the jury would not be permitted to apportion the damages. The rule goes back to the early days when the action of trespass was primarily a criminal action; and it has survived also in the criminal law. This principle, somewhat extended beyond its original scope, is still law. All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him.

W. Prosser, The Law of Torts § 46, at 291–92 (4th ed. 1971) (footnote omitted).

■ In our view, the evidence in this case can only reasonably be interpreted as showing that Reinhardt acted in concert with those members of Local 798 who actually beat Williams. Reinhardt's personal intent may have been that only an assault, in the sense of intimidation through the threat of a beating,[8] rather than a battery, occur. That is the best that can be said for his role in Williams' beating. The fact that he may have wished only to intimidate Williams, of course, does not exonerate him from the battery which followed. W. Prosser, *supra* at 291.

### III. LIABILITY OF LOCAL 798

The trial court ruled that even if Reinhardt had committed a tort against Williams, Local 798 would not be liable to Williams because Reinhardt's tortious acts would have been outside the scope of his union duties.[9]

---

**8.** Restatement (Second) of Torts § 21(1) (1965) states:

> (1) An actor is subject to liability to another for assault if
> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
> (b) the other is thereby put in such imminent apprehension.

Restatement (Second) of Torts § 30 states:

If the actor intentionally puts another in apprehension of an imminent and harmful or offensive contact, he is subject to liability for an assault although he gives to the other the option to escape the contact by obedience to a command given by the actor, unless the command is one which the actor is privileged to enforce by the infliction of the threatened contact or by a threat to inflict it.

**9.** The court reasoned:

■ The legal principles governing the question whether the union is liable in this case are straightforward. A master is liable for the torts of a servant committed while the servant is acting in the scope of his employment. *Kastner v. Toombs,* 611 P.2d 62–63 (Alaska 1980). This liability covers both negligent and intentional torts. Restatement (Second) of Agency § 245 (1958). The basis for charging a master with his servant's torts is

> the concept that a business should pay for the losses which it causes. Its foundation is "the desire to include in the costs of operation inevitable losses to third persons incident to carrying on an enterprise, and thus distribute the burden among those benefitted by the enterprise."

611 P.2d at 63, *quoting Fruit v. Schreiner,* 502 P.2d 133, 141 (Alaska 1972). Of course not every tort of a person who also happens to be an employee is chargeable to his employer.

> The acts of the employee need be so connected to his employment as to justify requiring that the employer bear that loss.... Employees' acts sufficiently connected with the enterprise are in effect considered as deeds of the enterprise itself.

*Fruit v. Schreiner,* 502 P.2d at 141.

■ The determination as to when an employee's tort will be attributed to the employer depends primarily on the facts and circumstances of each case. Guidelines which are useful in making this determination are set forth in the Restatement (Second) of Agency § 228 (1958).[10] One factor of importance regarding intentional torts specifically, is whether the servant's act, although not authorized, was "not unexpectable in view of the duties of the servant." Restatement (Second) of Agency § 245 (1958).

■ Although labor union stewards are not typically paid employees of their unions, these principles apply to the steward-union relationship. The union is vicariously liable for the torts of the steward performed within the scope of his agency. *Caldwell v. Farley,* 134 Cal.App.2d 84, 285 P.2d 294 (1955); *Herndon v. U.A.W. Local No. 3,* 56 Mich.App. 435, 224 N.W.2d 334 (1974). *See Titus v. Tacoma Smeltermen's Union Local 25,* 62 Wash.2d 461, 383 P.2d 504 (1963).

With these principles in mind we turn to the question whether Reinhardt's acts were sufficiently associated with the union to justify imposing liability on the union, that is, whether his acts were committed within the scope of his employment as a steward.

Reinhardt's responsibility as the steward for Local 798 at Tonsina camp was to represent the union's members there in processing and mediating their grievances and complaints. Reinhardt was selected as steward at Tonsina by the union president, and business agent, William Lancaster. Lancaster selected Reinhardt in part because of his ability to control the member-

---

The use of force upon others by a 798 steward was not the kind of activity he was engaged to perform. No purpose by William Reinhardt to serve Local 798 Union would have been involved in William Reinhardt's participation if the events had occurred as Plaintiff testified. Moreover, the use of intentional force by William Reinhardt in connection with his duties as a 798 steward was not expectable by Defendant Local 798 Union. William Reinhardt's alleged conduct, participation in the use of intentional assault upon Plaintiff, was different in kind from that authorized and would not have been actuated by a purpose to serve Defendant Local 798 Union....

**10.** The Restatement (Second) of Agency § 228 (1958) lists the following factors to be considered by the trier of fact in evaluating an employee's conduct:

> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master, and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

ship.[11] The testimony was uncontroverted that Reinhardt did exercise firm general control over the activities of the 798 members at the Tonsina camp.

Reinhardt's representational activities went beyond merely representing his men in grievances arising during working hours. Alyeska's camp operating supervisor, Barram, testified that he had dealt with Reinhardt numerous times concerning "grievances that his people might have within the camp.... The differences ranged from things like bad food to maybe catering or housing problems etcetera. And because he was representing his people [Reinhardt] was very emphatic that—that we look into these things and make sure the problems were resolved." Barram further testified that one of the functions of stewards on the pipeline, including Reinhardt, was "to keep the peace between" unions. Barram stated that if he had known on either the day of this attack or the day before that Williams had reason to believe that he might be attacked by individuals who were members of Local 798, "we would have sat down immediately with Bill Reinhardt, the steward for the 798 local ... and with Bob Williams ... and I'm certain that we could have resolved that situation right there."

Reinhardt's acts of calling the union meeting at the bus loading area, leading the union members to Williams for the purpose of extracting money and an apology, under a threat of violence, were closely connected with Reinhardt's union position. It was Reinhardt's position with the union that enabled him to call the meeting. Access to the camp public address system was afforded to him only because of his role as the leader of the Local 798 contingent. As the steward for Local 798 at Tonsina camp, Reinhardt had the authority to assemble his men at any time during non-working hours. This assembly occurred within normal time and space limits for camp union meetings. His conduct must have been actuated, at least in part, by a purpose to serve what he regarded as the cause of the union, for he could have had no personal motive for his activities.[12] He was, in a perverted sense, resolving a grievance held by some of the union's members. That a union steward might use the threat of force in representing his members, was not unexpectable.[13] This would seem to be especially true in a remote construction camp where close living conditions, the lack of normal diversions and the absence of law enforcement officials all would tend to foster intense and potentially violent rivalries.

█ In summary, considering (1) that Reinhardt in calling the union meeting and in acting to resolve a perceived grievance of some of the members was doing the general sort of thing he was engaged by the union to do; (2) that his acts occurred within authorized time and space limits; (3) that he was motivated, at least in part, to serve what he regarded as the purposes of the

11. Lancaster was asked and answered as follows:

Q. Do you look for leaders?
A. A lot of our stewards eventually make business agents. Sure, leaders.
Q. Leadership capability is one criteria you choose?
A. Well that and control.
Q. Control more than leadership?
A. Well maybe if I could explain it a little bit. We cover forty-two states. We've got members that live in all fifty states, and there is eight of us [business agents]. I have the Alyeska Project, plus Prudhoe Bay, East and West—so I expect a man to know what he is going [sic] because I can't be in every place at one time.

12. The facts that the original argument on the bus concerned union rivalry and that the torn tee-shirt bore the Local 798 logo suggest that union pride was the underlying cause of the dispute, as does the statement by one of the welders in the mob which attacked Williams that "we'll teach people not to ... with 798'ers."

13. See, e.g., Caldwell v. Farley, 134 Cal.App.2d 84, 285 P.2d 294 (1955) (steward threatened and assaulted tradesman from another union who had been critical of union plans); Herndon v. U.A.W. Local No. 3, 56 Mich.App. 435, 224 N.W.2d 334 (1974) (assault by steward in connection with grievance); N.L.R.B. v. United Brotherhood of Carpenters and Joiners of America, Local No. 55, 205 F.2d 515 (10th Cir. 1953) (steward threatened and struck non-union employee; held to be conduct attributable to union).

union; and (4) that his use of the threat of force was not unexpectable in the context of his position, we conclude that the trial court was clearly erroneous in concluding that Reinhardt was acting outside the scope of his agency.

## IV. CLAIM AGAINST ALYESKA

 The trial court found that Alyeska had a duty of ordinary care with respect to the safety of Williams. Williams challenges this on appeal, contending that Alyeska owed the same duty to Williams that a common carrier owes to its passengers.[14] However, this argument was not raised before the trial court and we will therefore not consider it on appeal. *Young v. Williams,* 583 P.2d 201, 206 (Alaska 1978); *Saxton v. Splettstoezer,* 557 P.2d 1126, 1127 (Alaska 1976); *Padgett v. Theus,* 484 P.2d 697, 700 (Alaska 1971).

 Williams does not directly argue that the court's findings that Alyeska was not negligent, based on a standard of ordinary care, are clearly erroneous. Those findings are supported by substantial evidence and therefore Williams' appeal regarding Alyeska must fail.[15]

REVERSED AND REMANDED for entry of a judgment of liability and a new trial on damages against Local 798 and William Reinhardt and AFFIRMED as to Alyeska.

BURKE, J., not participating.

COMPTON, Justice, dissents.

He is of the view that the trial court's findings (1) that Reinhardt did not commit a tort against Williams and (2) assuming arguendo that Reinhardt did commit a tort against Williams, that his activity was outside the scope of his union duties, are not clearly erroneous.

---

**14.** *See Widmyer v. Southeast Skyways,* 584 P.2d 1 (Alaska 1978).

**15.** In addition, we reject as unmeritorious the other claims of error asserted by Williams.