**Jane DOE, Petitioner,**

v.

**SAMARITAN COUNSELING CENTER, Respondent.**

No. S–2957.

Supreme Court of Alaska.

April 27, 1990.

Kirsten Tinglum and John C. McCarron, Ashburn & Mason, Anchorage, for petitioner.

Meredith A. Ahearn, Hagans, Brown, Gibbs & Moran, Anchorage, for respondent.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

### RABINOWITZ, Justice.

Jane Doe petitions for review of an order by the superior court granting respondent Samaritan Counseling Center ("Samaritan")[1] summary judgment on her *respondeat superior* claim.

*Introduction.*

Jane Doe argues that Samaritan should be held liable for the acts of one of its pastoral counselors, Reverend/Dr. John Garvin. Doe went to Samaritan for emotional and spiritual counseling. During two of her sessions with Garvin, kissing and fondling allegedly took place. After Doe cancelled her counseling sessions with Garvin, the two allegedly met and had sexual intercourse. Doe claims that she suffered emotional harm as a result of Garvin's abuse of their therapist-patient relationship. On summary judgment the superior court held that Samaritan could not be held liable for Garvin's actions on grounds of *respondeat superior*. We granted Doe's petition for review, and reverse.

*Facts and Proceedings.*

The relevant facts are undisputed. Doe began seeing Garvin for "emotional and spiritual therapy" in September of 1984. She went to see Garvin on advice from her minister that she seek counseling at Samar-

1. It appears from Doe's brief that the other co-defendants-below, Kenneth Walch and Nancy Sydnam, directors at Samaritan, were not charged with *respondeat superior* liability. Thus, they are not respondents in this proceeding.

2. Reverend/Dr. Robert Nelson, who supervises Samaritan counselors and acts as a consultant for the clinic, testified that the service offered to Doe was a combination of "psychology ... with the traditional healing practices of the church."

itan.[2] Doe had attended "approximately 34" sessions with Garvin by June of 1985.

In an affidavit Doe averred that:

5. In mid-June, 1985, Reverend Garvin announced suddenly that I was in need of no more therapy. This confused and upset me as I felt that I was still in turmoil and needed to resolve some issues. At the end of the session, I was feeling very vulnerable and asked him to hold me. He did, but began touching and fondling other parts of my body. Shortly thereafter, I had another session with Dr. Garvin at SCC during which he fondled and kissed me.

6. Dr. Garvin convinced me that we should meet outside his office. I did not want to lose him as a counselor so I continued to see him outside the office. I believed he still had my best interests at heart and would not do anything to harm me.

7. As I continued to meet with him, Reverend Garvin became more aggressive sexually. I confronted him about his conduct and he agreed he was wrong. However, the sexual contact continued until mid-July, when sexual intercourse occurred.

In December of 1985, Doe began seeing another counselor, Anne Nevaldine. Ms. Nevaldine testified that "[Doe] comes from an extremely unstable background. Any reasonable practitioner would have been able to see that she was easy prey for the kind of conduct reportedly engaged in by Dr. Garvin. As a result of Dr. Garvin's negligence, [Doe] has suffered substantial emotional and psychological damage." She also stated that Garvin negligently handled the "transference phenomenon"—a type of parent-dependent relationship which developed during counseling.

Reverend Nelson testified that he had attended conferences addressing the problem of sexual relations between pastoral counselors and patients since 1974. He further stated that the problem has received serious attention "for the last ... four or five years." Reverend Nelson also testified that Garvin was asked by Samaritan to resign because of his conduct in counseling Doe.

In June of 1987 Doe filed a complaint against Samaritan and two members of Samaritan's board of directors. Her complaint alleged a claim for relief against Samaritan based on a theory of *respondeat superior.* Doe also asserted claims based on "negligent hire, negligent supervision, and breach of contract" against Samaritan and the two directors. Thereafter Samaritan moved for summary judgment on the issues of *respondeat superior,* negligent hire, and negligent supervision. Doe filed a cross-motion for summary judgment as to Samaritan's liability in *respondeat superior.*

The superior court granted Samaritan's motion for summary judgment on the *respondeat superior* claim.[3] Thereafter we granted Doe's petition for review. We have concluded that the superior court's entry of summary judgment in favor of Samaritan should be reversed.

### DID THE SUPERIOR COURT ERR IN RULING THAT SAMARITAN COULD NOT BE HELD LIABLE ON THE THEORY OF RESPONDEAT SUPERIOR?

Under the doctrine of *respondeat superior,* an employer will be held liable for the tort of its employee if the employee's act was committed within the "scope of the employment." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts,* § 70, p. 502 (5th ed. 1984). While most authorities concur with this basic principle, there is disagreement over the meaning of the term "scope of employment." *See id.*

We have adopted a flexible, multifactored test to determine whether an employer is liable for injuries caused by its employees. Our approach to questions of *respondeat superior* evolved as an alternative to an overly technical "control" approach, which limited vicarious liability to circumstances where "the act of the employee was committed with the implied authority, acquiescence, or subsequent ratification of the employer." *Fruit v. Schreiner,* 502 P.2d 133, 140 (Alaska 1972).

In *Fruit,* an insurance salesman who was attending a convention as required by his employer struck and crippled a pedestrian while operating an automobile. 502 P.2d at 136. The accident occurred at 2:00 a.m., while the salesman was returning to his hotel room. He had been looking for out-of-state salesmen so that he could make sure they were enjoying themselves. The employer in that case argued that it should not be held liable because it was not in "control" of its employee's activities at the time of the accident, and because Fruit's acts had no business purpose. *Id.* at 139.

In *Fruit* we observed that

[N]o categorical statement can delimit the meaning of "scope of employment" once and for all time. Applicability of *respondeat superior* will depend primarily on the findings of fact in each case.

*Id.* at 140–41. We held that the superior court had correctly denied the employer's motion for Judgment NOV because "[t]here was evidence from which the jury could find that [the salesman] was at least motivated in part by his desire to meet with the out-of-state guests and thus to benefit from their experience so as to improve his abilities as a salesman." *Id.* at 142.

While it might be inferred from *Fruit* that there can be no *respondeat superior* liability where employee acts are not "motivated" by a desire to benefit the employer, our subsequent cases have left unresolved the question whether this motivation is a prerequisite to recovery based on a claim of *respondeat superior.* The instant case presents the issue squarely, for it is Samaritan's contention that since Garvin's tortious acts were not motivated by a desire to serve his employer, there cannot be liability based on a theory of *respondeat superior.*

A. *Can an Employer be Held Liable Under the Doctrine of Respondeat Superior Where the Employee's Acts Were Not Motivated by a Desire to Serve the Employer?*

Our decision in the *Fruit* case was closely followed by *Luth v. Rogers and Babler*

---

**3.** Summary judgment was denied as to all other claims for relief.

*Construction Company,* 507 P.2d 761 (Alaska 1973). In *Luth* we explained that questions of "control" and "motivation" were relevant factors to be considered in deciding whether an employee's act was "sufficiently related to his employer's enterprise." *Id.* at 764. However, we emphasized that "control" was not a prerequisite for *respondeat superior* liability, and that "[w]hile the employer's benefit from the employee's activity is relevant . . ., it is not its sole determinant." *Id.* Instead, we held that various other factors set forth in Section 228 of the Restatement (Second) of Agency (1958) ("Second Restatement") are relevant to the employee's vicarious liability. That section provides:

(1) *Conduct of a servant is within the scope of employment if, but only if:*

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Id.,* § 228 (*quoted in Luth,* 507 P.2d at 764 n. 14.) In *Luth* we expressly rejected the Second Restatement's view that *each* of the § 228(1)(a)–(d) factors must be satisfied prerequisite to recovery, and noted instead that the importance of various factors was to be weighed by the jury in each case. *Id.* at 764 & n. 14. We also noted that the question of the employee's "motivation to serve the employer" would be relevant in that case, but did not state whether that factor was an independent prerequisite. *Id.*[4] Thus, *Luth* stands for the proposition that the Second Restatement's factors are relevant considerations, but are not deter-

minative of the *respondeat superior* analysis.

Subsequently, in *Williams v. Alyeska Pipeline Service Co.,* 650 P.2d 343 (Alaska 1982), we referred to the criteria set forth in § 228 of the Second Restatement as "guidelines which are useful in making . . . the determination as to when an employee's tort will be attributed to the employer." *Id.* at 349.

### B. *"Motivation to Serve".*

A number of courts holding that "motivation to serve" is a prerequisite to any recovery in *respondeat superior* have held that employers cannot be held liable for the sexual acts of their employed therapists or doctors, since sexual acts, though perhaps motivated by desire, are not motivated by a desire to serve the employer. *E.g., Andrews v. United States,* 732 F.2d 366, 370 (4th Cir.1984) (under South Carolina law, employer not liable for acts of therapist in inducing patient to have sex because therapist acted on own, and not in furtherance of employer's interest); *Hoover v. University of Chicago Hospitals,* 51 Ill.App.3d 263, 9 Ill.Dec. 414, 366 N.E.2d 925, 929 (1977) (hospital not liable under theory of *respondeat superior* because doctor's act of raping patient was not committed in furtherance of hospital's interests); *Cosgrove v. Lawrence,* 214 N.J.Super. 670, 520 A.2d 844, 846–48 (1986) (therapist's act of sex with patient was not motivated by desire to serve hospital), *aff'd* 215 N.J.Super. 561, 522 A.2d 483, 484–85 (1987) (affirmed on ground that act not of the type therapist was employed to perform).

In contrast, other courts employing the "motivation to serve" analysis have concluded that employers may be held liable for the sexual behavior of their therapist employees towards their patients. One line of authority, exemplified by Judge Friendly's opinion in *Ira S. Bushey & Sons v. United States,* holds that an employer may be held liable for employee acts that are

---

**4.** In *Luth* we noted that "[c]onduct of a servant *is not* within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or

*too little actuated by a purpose to serve the master."* 507 P.2d at 764 n. 14 (emphases added).

"foreseeable" in light of the nature of the employment. 398 F.2d 167, 171–72 (2d Cir. 1968) ("motivation to serve" test discarded in favor of "foreseeability" approach).[5] These courts reason that while the sexual acts themselves are purely self-serving, or caused by an unjustifiable loss of control by the aggressor, they have nonetheless been precipitated by the employee's performance of assigned duties.[6]

In *Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986), a case factually similar to the instant litigation, the Ninth Circuit held that an employer could be liable on grounds of *respondeat superior* for the tortious sexual conduct of a therapist. *Id.* at 1371. The patient had sought "mental health counseling" from a social worker. *Id.* at 1364. A "transference phenomenon" similar to the one which is alleged to have occurred in the case at bar caused the patient to feel dependent upon the social worker. *Id.* at 1364–65. The social worker then began a sexual relationship with the patient, and this relationship was found to have caused the patient emotional problems so devastating that years later she attempted to commit suicide. *Id.* at 1364–65. The *Simmons* court held the social worker's employer liable in *respondeat superior* for its employee's misfeasance. *Id.* at 1371.

The Ninth Circuit's analysis turned on whether the sexual conduct was actuated to "further[ ] ... the employer's interest ..., or benefit the employer." *Id.* at 1369. The court explained:

5. *See also Marston v. Minneapolis Clinic of Psychiatry*, 329 N.W.2d 306, 311 (Minn.1983) (clinic could be held liable for the tortious sexual conduct of a psychologist towards a patient during and following therapy).

6. In *Turner v. State*, 494 So.2d 1292 (La.App. 1986), the Louisiana Court of Appeals employed a multi-factored test and concluded that the National Guard would be liable for the unauthorized sexual conduct of a recruiting officer during the conduct of a physical examination. *Id.* at 1296. The fact that the act was "motivated" by personal desires was not considered determinative; rather, the court premised its finding of liability on the ground that the sexual act was "incidental" to the employment, and "attributable" to the employer. *Id.*

7. Restatement § 228(2) provides in part that the employee's act may not be "different in kind from that authorized." *See also Luth*, 507 P.2d

In the instant case, Mr. Kammers was employed to provide mental health counseling and although he was not authorized to become sexually involved with his clients, that contact occurred in conjunction with his legitimate counseling activities....

.... 

... The centrality of transference to therapy renders it impossible to separate an abuse of transference from the treatment itself. The district court correctly found that the abuse of transference occurred within the scope of Mr. Kammers' employment.

*Id.* at 1369–70. Thus, the *Simmons* court rejected the employer's contention that the social worker's conduct was not performed in furtherance of the employer's interests.

■ This reasoning persuades us that where tortious conduct arises out of and is reasonably incidental to the employee's legitimate work activities, the "motivation to serve" test will have been satisfied. Given the transference phenomenon that is alleged to have occurred in this case, we hold that it could reasonably be concluded that the resulting sexual conduct was "incidental" to the therapy.[7]

■ We are not unmindful of the force of those authorities which hold that an employee's tortious sexual behavior is impelled by motivations other than a desire to further the interests of the employer.[8]

at 764 n. 14. An employee is rarely authorized to commit a tort. We therefore construe this provision to mean only that the act which leads to the tortious behavior cannot be different in kind from acts the employee is authorized to perform in furtherance of the employer's enterprise.

Employing this construction, we hold that a jury might reasonably find that Garvin's tortious conduct arose out of, and was reasonably incidental to counseling activities authorized by and of potential benefit to Samaritan.

8. *See, e.g., John R. v. Oakland Unified School District*, 48 Cal.3d 438, 256 Cal.Rptr. 766, 774, 769 P.2d 948, 956 (1989) (risk of sexual misconduct not "within range of risks allocable to ... a[n] employer").

However, we are of the view that the "motivation to serve" test, so construed, would too significantly undercut the enterprise liability basis of the *respondeat superior* doctrine we have previously articulated. In *Fruit,* we discussed this basis for the doctrine, saying,

> "Scope of employment" as a test for application of *respondeat superior* would be insufficient if it failed to encompass the duty of every enterprise to the social community which gives it life and contributes to its prosperity.... The basis of *respondeat superior* has been correctly stated as "the desire to include in the costs of operation inevitable losses to third persons incident to carrying on an enterprise, and thus distribute the burden among those benefited by the enterprise."
>
> ....
>
> Although not usually enunciated as a basis for liability, in essence the enterprise may be regarded as a unit for tort as opposed to contract liability purposes. Employees' acts sufficiently connected with the enterprise are in effect considered as deeds of the enterprise itself. Where through negligence such acts cause injury to others it is appropriate that the enterprise bear the loss incurred.

502 P.2d at 140–41.

### C. Did The Tort Occur Within Authorized Time and Space Limits?

■ The final requirement for *respondeat superior* liability set forth in § 228(2) is that the tortious conduct must not be "far beyond ... authorized time or space limits."

#### (i) Time.

Garvin's fondling of Doe occurred during two counseling sessions, but the intercourse occurred during the month following Doe's cancellation of therapy, and other "sexual conduct" occurred at unspecified times. Nonetheless, Dr. Nevaldine characterizes Garvin's conduct during counseling as the initiation of a "sexual relationship." Thus, a trier of fact could reasonably conclude that Garvin's tortious conduct occurred within authorized time limits, and there was evidence to support the view that this conduct caused Doe damage.

#### (ii) Space.

Samaritan further contends that since the sexual intercourse occurred after counseling had been terminated and took place away from its "premises," Samaritan should not be held accountable in damages for this occurrence. Doe argues that Samaritan should be held liable for the damage resulting from the sexual intercourse, as well as the fondling which occurred during counseling sessions.

A trier of fact might reasonably conclude that the sexual intercourse, which occurred roughly one month after counseling, was so connected with the tortious misuse of the transference phenomenon during counseling that it was not "too far" removed from authorized time and space limits. *See Simmons,* 805 F.2d at 1370 (negligence in mishandling of transference phenomenon leads to sexual intercourse); *see also Marston,* 329 N.W.2d at 311.[9] On remand, the superior court should determine the extent to which the intercourse was connected with misuse of the transference phenomenon.

■ Inherent in our disposition of this petition is our further conclusion that Doe is not entitled to summary judgment on her *respondeat superior* claim given the existence of genuine issues of material fact relevant to this claim.

---

9. In applying the criteria set forth in sections 228(1) and 229 of the Restatement, the trier of fact must determine whether the particular facts of the case lead to the conclusion that an act was or was not within the employee's "scope of employment." *See Luth,* 507 P.2d at 764 & n. 14. Since the § 228(2) criteria are also included as factors to be considered under §§ 228(1) and 229 of the Restatement, and since à trier of fact could reasonably find that the § 228(2) factors have been satisfied, we hold that a trier of fact could also reasonably conclude that the corresponding §§ 228(1) and 229 factors have been satisfied, and that consideration of all relevant factors therfore could result in *respondeat superior* liability in the instant case.

The superior court's grant of summary judgment in favor of Samaritan on Doe's *respondeat superior* claim is REVERSED and the matter REMANDED for further proceedings consistent with this opinion.

MOORE, J., dissents.

MOORE, Justice, dissenting.

Sexual conduct between a psychotherapist and his patient is one of the most notorious forms of psychotherapist malpractice.[1] By engaging in sex with his patient, a therapist intentionally disregards well established standards of professional conduct. However, the court holds that this intentional misconduct may fall within the scope of a therapist's employment so that it is appropriate to apply the doctrine of "respondeat superior" to impose strict liability on his employer. I believe that it is both unfair and unwise to impose the cost of this intentional breach of ethical standards on the psychotherapeutic community at large through the application of respondeat superior. Therefore, I respectfully dissent.

The doctrine of respondeat superior imposes vicarious liability on an employer for the torts of an employee if they are committed within the scope of his employment. *Fruit v. Schreiner*, 502 P.2d 133, 140 (Alaska 1972). As we discussed in *Fruit*, one of the purposes of respondeat superior. is "to include in the costs of operation *inevitable losses to third persons incident to carrying on an enterprise*, and thus distribute the burden among those benefitted by the enterprise." 502 P.2d at 141 (emphasis added). It is fair to place these losses on the employer because he sought to profit from an enterprise in which his employees will inevitably commit torts and because he is better able to distribute the loss through increased prices or liability insurance. W.P. Keeton, *Prosser and Keeton on the Law of Torts* § 69, at 500–01

(5th ed.1984). Thus, we have not interpreted the phrase "scope of employment" so as to impose liability on employers for all torts of their employees. "The acts of the employee need be so connected to his employment as to justify requiring that the employer bear that loss.... Employees' acts sufficiently connected with the enterprise are in effect considered as deeds of the enterprise itself." *Fruit*, 502 P.2d at 141. In determining the sufficiency of this connection, we have looked to the Restatement (Second) of Agency §§ 228–229 (1957) [hereinafter Second Restatement] as a set of guidelines indicating whether conduct is within the scope of employment. *Luth v. Rogers and Babler Constr. Co.*, 507 P.2d 761, 764 n. 14 (Alaska 1973).

The court focuses primarily on Second Restatement § 228(1)(c) which requires that the conduct "is actuated, at least in part, by a purpose to serve the master." This "motivation to serve" factor preserves the fairness aspect of the basis of vicarious liability that an employer profits from the enterprise in which his employee's acts inevitably will include torts. There is no reasonable interpretation under which Garvin's sexual misconduct[2] possibly could benefit Samaritan. In a factually similar case, a New Jersey court found that the therapist "had betrayed his trust as a therapist and that his conduct was too little actuated by a purpose to serve his employer." *Cosgrove v. Lawrence*, 214 N.J.Super. 670, 520 A.2d 844, 848 (1986), *aff'd*, 215 N.J.Super. 561, 522 A.2d 483 (1987).

The court, however, reinterprets the "motivation to serve" factor as requiring only that the tortious conduct "arises out of and is *reasonably incidental* to the employee's legitimate work activities...." *Supra* at 348 (emphasis added). Even under this weakened standard, respondeat superior should not apply because therapist-patient sex is not "reasonably incidental"

---

1. *See* Davidson, *Psychiatry's Problem with No Name: Therapist–Patient Sex*, 37 Am.J. Psychoanalysis 43, 48–49 (1977) ("[I]t is generally agreed that therapist-patient sex is psychologically deleterious for the involved woman patient and is unethical practice for the male practitioner....").

2. Both parties agree that the tortious conduct in question was Garvin's engaging in sexual relations with Doe. Doe alleges that "Garvin breached his duty as counselor *by engaging in sexual activity with Doe.*" (Emphasis added).

to psychotherapy. To understand this, it is essential to consider the nature of therapist-patient sex and its relationship to the objectives of psychological counseling. The parties agree that the sexual conduct at issue stemmed from the therapist's exploitation of a psychotherapeutic phenomenon known as the transference. Dr. Robert Nelson, a founder of Samaritan and a consulting pastoral counselor, explained the concept of transference as follows:

> Transference is a phenomenon that occurs that is similar to a state of dependency in which the client begins to project the roles and relationships and the images and experiences that they have had with other people previous in their life, especially significant other people such as mother, father, brothers, sisters, early teachers and adult models, upon the therapist.

Dr. Nelson continued that since the transference relationship is very "delicate" and "fragile," "the counselor has [a] professional and ethical responsibility to manage that relationship ... so the client is not damaged in any way." This duty is manifest in the accompanying phenomenon of the "countertransference" where "the counselor ... begins then to project out of his or her own experience and previous relationships in life upon the client." Dr. Nelson testified that "countertransference is a very dangerous thing." He concluded that "any kind of sexual acting out is an extreme form of the misuse of countertransference...."

Dr. Nelson's testimony is consistent with the psychotherapeutic community's unanimous view that a therapist's exploitation of the transference in order to engage in sexual conduct with his patient is unethical. See Davidson, *supra* note 1 at 43; Stone, *The Legal Implications of Sexual Activity Between Psychiatrist and Patient*, 133 Am.J. Psychiatry 1138, 1139 (1976) ("[t]he experts would ... agree ... that 'there are absolutely no circumstances which permit a psychiatrist to engage in sex with his pa-

tient.' All such instances constitute misuse of the transference.") Therapist-patient sex is not a result of a therapist's negligence. Garvin's mishandling of the transference was not accidental. He did not make a mistake. Rather, he intentionally acted on his own feelings for his patient.[3]

Given this factual background, the court's conclusion that the sexual conduct in this case was " 'incidental' to the therapy," *supra* at 348, is confused. Therapist-patient sex arises not out of the transference, which is essential to the therapy, but the intentional abuse of the transference. Although Doe styles her complaint to sound in negligence, she alleges that Garvin's sexual conduct stemmed from his intentional abuse of the transference in order to derive personal sexual gratification. Doe states in her brief that "this sexual activity was an *exploitation* of Garvin's therapist-patient relationship with Doe." (Emphasis added). This allegation is supported by Doe's affidavit testimony: "As I continued to meet with him, Reverend Garvin became more aggressive sexually. I confronted him about his conduct and *he agreed he was wrong*. However, the sexual contact continued until mid-July, when sexual intercourse occurred." (Emphasis added). Regardless whether Doe's complaint sounds in professional malpractice or intentional tort, it is undisputed that Garvin intentionally disregarded well established standards of professional conduct by engaging in sexual relations with Doe.

The court's error can be traced to its reliance on the reasoning of the Ninth Circuit in *Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986). The *Simmons* court found that a therapist's sexual conduct with a client "occurred in conjunction with his legitimate counseling activities" because it arose out of the transference. 805 F.2d at 1369. The court reasoned that "the centrality of transference to therapy renders it impossible to separate an abuse of transference from the treatment itself."

---

**3.** One commentator, finding the idea "absurd" that any well-qualified therapist could not help himself from acting out his sexual feelings, states that such an impulse-ridden person would scarcely be safe on a dance floor. E. Mintz, *Touch and Psychoanalytic Tradition*, 56 Psychoanalytic Rev. 365 (1969).

805 F.2d at 1369–70. This is just wrong. That transference is an essential component of psychotherapy does not imply that an intentional abuse of transference in order to derive personal sexual gratification is also essential. As the *Cosgrove* court held:

> [I]t cannot be said that the sexual intercourse was so fairly and reasonably incidental to the therapy that it may be regarded as a method of carrying out the objectives of the employment. Not only was such conduct prohibited by the employer, but it violated the guidelines set forth in the code of ethics of the National Association of Social Workers.

520 A.2d at 847. Garvin's intentional disregard of professional standards of conduct is diametrically opposed to his legitimate work activities.

Consider the case of an associate lawyer who discloses the confidences of his client for personal gain in violation of the rules of professional conduct. The client sues the lawyer's firm for damages under a respondeat superior theory. Under the court's reasoning, since the confidential relationship between a lawyer and a client is an essential component of legal representation, a lawyer's abuse of that relationship is reasonably incidental to legal representation and therefore falls within his scope of employment. However, the court surely would not consider a lawyer who breached his duty of confidentiality for personal gain to be "motivated to serve" his law firm. Conduct constituting an intentional violation of professional ethical standards for personal benefit cannot be considered reasonably incidental to the profession.

The court next considers whether Garvin's conduct fits the requirement of Second Restatement § 228(2) that an employee's conduct may not be "different in kind from that authorized." Since employees are seldom employed in order to commit torts, the majority interprets this provision to mean that "only the act which leads to, and is incidental to the tortious behavior cannot be different in kind from acts the employee is authorized to perform in furtherance of the employer's enterprise."

*Supra* at 348 n. 7. The majority concludes without argument "that a jury might reasonably find that Garvin's tortious conduct arose out of, and was reasonably incidental to counseling activities authorized by and of potential benefit to Samaritan." *Id.*

To what authorized counseling activities does the court refer? If the court means psychotherapy, it is just false that Garvin's sexual misconduct arose out of psychotherapy. Therapist-patient sex stems not from the transference, but from its intentional abuse. On the other hand, if the court means Garvin's intentional abuse of the transference, such conduct was not authorized. There simply is no reasonable interpretation under which Garvin's sexual misconduct was reasonably incidental to his authorized duties as a psychotherapist.

Finally, the court considers whether the tortious conduct occurred "substantially within the authorized time and space limits." Second Restatement § 228(1)(b). Relying on the fact that sexual fondling occurred during counseling, the court concludes that "a trier of fact could reasonably conclude that Garvin's tortious conduct occurred within authorized time and space limits...." *Supra* at 349. The court misapplies the criterion. The question is not whether *any* tortious conduct occurred within authorized time and space limits. Garvin clearly satisfies that criterion on the undisputed facts. The question is rather whether the conduct occurred "substantially" within those limits. It is undisputed that except for two instances of fondling, all the tortious conduct including sexual intercourse occurred not only outside of the office, but also after termination of therapy. No reasonable trier of fact could conclude that the tortious conduct occurred substantially during therapy. Faced with similar facts, the *Cosgrove* court correctly reasoned:

> [P]laintiff and defendant Lawrence engaged in sexual intercourse not only in Lawrence's office at the county operated mental health center, but in parks, and Lawrence's home. Such conduct off the mental health center's premises cannot be said to be within the authorized time

and space limits as required by sec. 228 of [the Second Restatement].

520 A.2d at 848.

In sum, the court misapplies the Second Restatement criteria in determining that therapist-patient sex is "reasonably incidental" to psychotherapy and therefore reasonably may be considered within the scope of employment for purposes of respondeat superior liability. There is no reasonable interpretation of those criteria that would justify imposing liability on mental health employers for the sexual misconduct of their therapists.

The court's erroneous application of the Restatement criteria is obvious when viewed in light of the purposes of respondeat superior liability. In an important case last year, the California Supreme Court held as a matter of law that a school district could not be held vicariously liable for a teacher's sexual abuse of a fourteen year old junior high school student. *John R. v. Oakland Unified School District*, 48 Cal.3d 438, 256 Cal.Rptr. 766, 771–75, 769 P.2d 948, 953–57 (1989). Although *John R.* did not involve psychotherapy, the dependency existing in the teacher-student relationship is analogous to the dependency existing in the therapist-patient relationship on account of the transference phenomenon.[4] The California court cited several cases involving therapist-patient sex, including *Simmons*, as relevant to its resolution of the issue in *John R.* 769 P.2d at 953 n. 8. Unlike many courts that woodenly apply the Second Restatement criteria to the facts of the case, the California court analyzed the question in terms of the policies to be served by imposing liability. The court considered three reasons for imposing liability on an enterprise for the risks incident to the enterprise:

(1) [I]t tends to provide a spur toward accident prevention; (2) it tends to provide greater assurance of compensation for accident victims[,] and (3) at the same time it tends to provide reasonable assurance that, like other costs, accident loss-es will be broadly and equitably distributed among the beneficiaries of the enterprises that entail them.

769 P.2d at 955.

With respect to accident deterrence, the court found that it "plays little role in the allocation of responsibility for the sexual misconduct of employees generally...." 769 P.2d at 956. Since a therapist's sexual misconduct stems from his intentional disregard of well established standards of professional conduct, there is little that an employer can do to reduce its occurrence. Although Samaritan may be able to reduce the incidence of sexual misconduct through careful selection of its therapists and close monitoring of their conduct, it is already subject to a duty to exercise due care in that regard. In this very case, Doe claims that Samaritan was negligent in its hiring and supervision of Garvin. To render mental health employers strictly liable for the sexual misconduct of their employees at best would be ineffectual. At worst, it could threaten the therapeutic process itself by encouraging employers to invade the privacy of the therapist-patient relationship.

The *John R.* court also found the second reason—assurance of compensation—inapplicable to the case of sexual misconduct.

The acts here differ from the normal range of risks for which costs can be spread and insurance sought. The imposition of vicarious liability on school districts for the sexual torts of their employees would tend to make insurance, already a scarce resource, even harder to obtain, and could lead to the diversion of needed funds from the classroom to cover claims.

769 P.2d at 956 (citation omitted). The same considerations apply with even more force in the case of mental health employers. Imposing vicarious liability would tend to make medical malpractice insurance, already a scarce and expensive resource, even harder to obtain. It is also unclear whether medical malpractice insur-

---

4. Dr. Nelson testified that "the counselor/counselee relationship could be described psychologically as similar to a parent authority figure and child dependent relationship." In fact, one of the roles that the patient projects on the therapist is that of an "early teacher[ ]."

ance would even cover sexual misconduct. Whether or not mental health employers could insure against this risk, they would have to raise the cost of their services dramatically. Mental health services would be denied to those who are least able to pay. While victims of therapist sexual misconduct may enjoy a greater chance of being compensated, the cost of creating that benefit in reduced access to mental health services is unacceptable.

Finally, the court concluded that it would be unfair to spread the risk of the abuse of the dependency relationship between teacher and student among the beneficiaries of public schools:

> [T]he connection between the authority conferred on teachers to carry out their instructional duties and the abuse of that authority to indulge in personal, sexual misconduct is simply too attenuated to deem a sexual assault as falling within the range of risks allocable to a teacher's employer.

*John R.*, 769 P.2d at 956. Similarly, in this case, it would be unfair to impose the risk of a therapist's abuse of the dependency created by the transference on his employer. Sexual misconduct is not an improper method of carrying out the authority granted to a therapist; rather, it constitutes an intentional abuse of that authority for personal gratification.

The motivation for the court's holding is not difficult to find. Therapist-patient sex is a serious problem in the psychotherapeutic community. However, imposing vicarious liability on mental health employers for the sexual misconduct of their employees is not an appropriate response to the problem. First, imposing vicarious liability would create incentives to invade the privacy of the therapist-patient relationship that is essential to the psychotherapeutic enterprise. Second, it would restrict access to mental health services to those who are least able to afford them. Third, and perhaps most important, spreading the cost of therapist-patient sex to the consumers of mental health services is unfair. Therapist-patient sex, although not uncommon, is not an inevitable cost of mental health care. It is a cost imposed by therapists

who intentionally disregard the standards of conduct of mental health professionals for personal sexual gratification. For these reasons, I would affirm the superior court's decision granting Samaritan summary judgment on Doe's respondeat superior claim.