OPINION OF THE COURT
Leonard Livote, J.
It is ordered that the motion is denied.
This action arises out of a “Brit Milah” (a religious circumcision) performed on the infant plaintiff by Rabbi Mordechai Rachminov at Bukharian Jewish Community Center (BJCC) on October 16, 2010. Plaintiffs later learned that the infant plaintiff suffered a severe circumcision injury during the brit; that defendant Rachminov had cut off more than the infant plaintiff’s foreskin; and that Rachminov had negligently excised part of the infant plaintiff’s corona glandis, distal shaft skin and completely unroofed the shaft of the penile urethra proximal to the glans. Defendant BJCC moved to dismiss the complaint on the grounds that Rabbi Rachminov was an independent contractor .and that the BJCC owed no duty to plaintiffs therefore. Defendant BJCC contends that it owed no duty to plaintiff because the BJCC did not select or designate Rachminov to be the mohel for the infant plaintiff’s circumcision; that at the time Rachminov performed the circumcision, he was not in the employ of the BJCC; and that the BJCC did not direct, supervise or control Rachminov in his performance of the circumcision. Defendant BJCC further contends that no one in its employ provided plaintiff with treatment, and that its only involvement in this procedure was to provide the venue to Rachminov, for which it received no gain, financial or otherwise. Plaintiffs maintain that the circumcision was a religious ritual which was performed on the premises of the BJCC by Rabbi Rachminov who was affiliated with the BJCC. Plaintiffs oppose the motion on the ground that issues of fact exist as to the whether Rabbi Rachminov was an independent contractor and, in any event, the BJCC had a duty to provide a proper venue for the procedure since it regularly held itself out as such.
Facts
Plaintiffs are Y.Y.B., a male minor child, and his father, Gavriel Barukh. Mr. Barukh was born into a Bukharian Jewish family. Practicing Bukharian Jews follow the orthodox branch of Judaism that emphasizes the entirety of Jewish law. *1057 They have their own rabbis and follow some customs that are unique to them.
In 2010, Itzhak Yehoshua was held out to be the “Chief Rabbi of the [Bukharian Jewish] Congress and the New York BJ Center,” and defendant Rachminov was held out to be the “Rabbi of the New York BJ [Bukharian Jewish] Main Synagogue.” At that time, Rachminov generally led the daily morning, afternoon and evening prayers. Rachminov also generally led the services on Shabbat (the Sabbath). Rachminov also performed weddings, funerals, bar mitzvahs and other Jewish religious services and rituals, including circumcisions. Rabbi Yehoshua conducted daily evening study of the Talmud, led the services for the Youth Minyan on the Sabbath and, at times, assisted in conducting other services and rituals, including britot.
Gavriel Barukh avers and testified upon an examination before trial, as follows: Rachminov performed his bar mitzvah when he was 13 in 1999, and conducted his wedding ceremony in 2009. He states that at the end of the ceremony, Rachminov stated in front of wedding guests that “in 9 months (God willing), you’ll have a baby boy and I will conduct the brit to which guests responded ‘Amen.’ ” Barukh has viewed Rachminov as his rabbi because he trusted the BJCC, which he understood was run by the Congress, as the center and heart of his religious community, to provide Barukh with a rabbi who was knowledgeable in Jewish law and skilled in the performance of his duties and of all religious duties and obligations that he undertook, including circumcisions. In 2010 Barukh regularly attended the BJCC’s main synagogue and that not only was Rachminov the main rabbi for the main synagogue, but he was also a mohel, a Jewish man trained to perform the Jewish ritual circumcision known as Brit Milah. Not all rabbis are mohels, nor are all mohels rabbis. During the time that he attended the main synagogue, Barukh never saw anyone but Rachminov perform a circumcision there.
Barukh explains that in Orthodox Judaism, a male must be circumcised on the eighth day of his life in order to fulfill the mitzvah or commandment of circumcision so that the child may enter the covenant between God and the Jewish people. It is one of the most important requirements of Jewish life that a baby boy be circumcised on the eighth day. Furthermore, in Judaism, it is generally preferable that a circumcision take place in a synagogue in front of a congregation. In fact, it is prefer *1058 able that 10 Jewish males (a minyan) be present to witness the circumcision. The BJCC not only provides the synagogue for the circumcision of Bukharian Jewish baby boys, but it also provides rooms and catering for the celebratory meal that generally takes place after the circumcision.
When his son was born, Barukh contacted Rachminov and asked him to perform the circumcision on the eighth day, which was the Sabbath, at the end of the main synagogue. Barukh states that he relied upon the BJCC to provide him with the place, arrangements and the mohel (Rachminov) to perform the brit, since it did so for all other Bukharian Jewish britot he had attended at the main synagogue.
The Brit Milah of the infant plaintiff took place on Saturday, October 16, 2010, a Sabbath, immediately following the conclusion of the morning services, on the main floor of the main synagogue at the BJCC. At the time of the brit, Rachminov had just completed conducting the Sabbath morning services and, Barukh observed, there were many more congregants than there would have been if it had not been the Sabbath. The congregation was still present. Rabbi Yehoshua was also present and participated in the brit by giving the infant plaintiff his Jewish name. After the infant plaintiff was brought into the main synagogue and was placed on the lap of Barukh’s grandfather, who was the sandek, Barukh observed that the men in the congregation began to crowd around the platform on which the circumcision was being performed by Rachminov. Barukh observed that the press of the crowd was “very great” and his father, Steven Barukh, and he tried to hold the men back so as not to jostle Rachminov as he cut off the infant plaintiff’s foreskin. Despite the press of the crowd, Barukh avers, neither Rachminov nor Rabbi Yehoshua tried to get the men to stop from pressing in on Rachminov. As a result, Barukh avers, it appeared as if Rachminov became nervous and as a result, hurried the operation.
Barukh later learned that his son had suffered a severe circumcision injury during the brit. Barukh testified that his son underwent two surgeries to date to correct the injuries caused by the brit, and to make the penis functional so that the infant plaintiff could urinate normally. Barukh also testified that his son will also need reconstructive surgery in the future.
Finally, in response to questioning by the BJCC attorney as to why the circumcision was not done in a hospital, Barukh *1059 explained that it is the Orthodox Jewish law that the baby be circumcised in the “shul” (synagogue) by the mohel, with at least 10 men present, in the proper minyan setting. Barukh explained that it would not have otherwise been kosher to have the circumcision performed in a hospital by a doctor. He testified that “ [i]f a doctor would have done it [performed the circumcision], it is not a religious service, it would mean he is not Kosher . . . Didn’t do the covenant with God . . . Not a valid circumcision by the law of the Torah.”
Rachminov testified, upon his examination before trial, that he was employed by the BJCC, and was paid $5,000 per month in salary by the BJCC. Rachminov testified that one of the purposes of the BJCC was to provide a place for the performance of Brit Milah, and also that the Chief Rabbi of the BJCC, Itzhak Yehoshua, was his superior who supervised him.
Discussion
It is undisputed that BJCC provided the venue so that a circumcision could be performed; that it was performed by Rabbi Rachminov; and that plaintiff sustained an injury.
Rabbi Rachminov testified upon his examination before trial and conceded that he performed the circumcision. BJCC submits that Rachminov was an “independent contractor” such that they cannot be held liable for any alleged negligence on the part of Rachminov.
Inherent in the issue is the seeming conflict between medicine and religion. Section 6521 of the Education Law provides: “The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition” (emphasis supplied). It has been inferentially held that although a circumcision is a surgical procedure it, nevertheless, does not constitute the practice of medicine (see Matter of Oliner v Lenox Hill Hosp., 106 Misc 2d 107 [1980]).
A religious ritual, such as a circumcision, anciently practiced and reasonably conducted, is not subject to governmental restrictions so long as it is consistent with the peace or safety of this state (see NY Const, art I, § 3). Therefore, while a circumcision performed by a physician would be the practice of medicine, a circumcision performed as a religious ritual by a qualified person (a “mohel” in this case) does not constitute the practice of the profession of medicine within the meaning of the Education Law. Nevertheless, the principles of negligence *1060 still apply. The law holds the mohel to “the professional standards of skill and care prevailing among those who perform circumcisions” (Zakhartchenko v Weinberger, 159 Misc 2d 411, 413 [Sup Ct, Kings County 1993]). Therefore, Rabbi Rachminov must meet the professional standards of skill and care prevailing among those who perform circumcisions (see Brown v Shyne, 242 NY 176 [1926]).
Because religious organizations do not enjoy absolute immunity from tort liability, it is not unprecedented to subject members of the clergy to liability for negligence, including standards of professional care and fiduciary duties. The cases demonstrate that if a clergyperson holds himself out as having the skill and experience of a secular professional and undertakes to provide a secular service, he can be held to the same secular standard of care by which secular professionals are held under similar circumstances (Moses v Diocese of Colo., 863 P2d 310, 320-321 [Colo 1993], cert denied 511 US 1137 [1994] [holding that “actions against clergy members and their superiors that involve claims of a breach of fiduciary duty . . . are actionable”]; Doe v Samaritan Counseling Center, 791 P2d 344 [Alaska 1990] [clinic could be liable under respondeat superior for mishandling of transference by pastoral counselor]; Zakhartchenko v Weinberger, 159 Misc 2d 411 [Sup Ct, Kings County 1993] [rabbi who performs circumcisions as part of a Jewish ritual must meet standards of skill and care prevailing among secular professionals who perform circumcisions]; Adams v Moore, 96 NC App 359, 385 SE2d 799 [1989], review denied 326 NC 46, 389 SE2d 83 [1990] [preacher owed a fiduciary duty to a parishioner and violated that duty by using his position and influence to obtain the deed to the parishioner’s home and then selling it for a quick profit]; Erickson v Christenson, 99 Or App 104, 781 P2d 383 [1989] [holding a priest who abuses his role as counselor can be liable for breach of fiduciary duty]).
As for BJCC, given the unique nature of the procedure, that is, where one may reasonably expect a safe environment and a competent performance, BJCC can be held liable even if the services are rendered by an independent contractor in the same manner as if there were a doctor/patient relationship, if there is reliance on the services of the facility (see Hill v St. Clare’s Hosp., 67 NY2d 72 [1986]; Lanza v Parkeast Hosp., 102 AD2d 741 [1984]; Felice v St. Agnes Hosp., 65 AD2d 388 [1978]; Mduba v Benedictine Hosp., 52 AD2d 450 [1976]).
*1061 In the case at bar, plaintiff Barukh testified the BJCC held itself out as a place where Brit Milah can be performed, that they advertised as such and that he relied upon the same. Barukh testified that on the date in question he observed an unruly “crowd” at the religious services where the circumcision was performed, and that the “crowd” may have distracted Rachminov while he was performing the circumcision. He testified that he and his father attempted to hold the “crowd” back while Rachminov was performing the circumcision. This observation coupled with the allegation that Rachminov was distracted by the actions of the attendees during the procedure all raise issues of fact requiring a trial.
Furthermore, BJCC failed to make a prima facie showing of its entitlement to judgment as a matter of law. BJCC failed to submit a copy of its charter or other governing laws which might establish the terms of the employ of Rachminov (see Carrion v Orbit Messenger, 82 NY2d 742 [1993]; Montanaro v Hossain, 74 AD3d 1157, 1158 [2010]; see e.g. Rivera v Fenix Car Serv. Corp., 81 AD3d 622, 624 [2011]). BJCC also failed to eliminate all questions of fact as to whether Rachminov was independent of BJCC or an alter ego thereof (see Carrion v Orbit Messenger, 82 NY2d at 742; Christ v Ongori, 82 AD3d 1031, 1032 [2011]; Montanaro v Hossain, 74 AD3d at 1158; Lane v Lyons, 277 AD2d 428, 428 [2000]). The proffered evidence sheds no light on the actual degree of control any defendant had over any other defendant, and it reveals very little about the relationship of BJCC to Rachminov. In short, BJCC failed to submit documentary evidence conclusively establishing that Rachminov was an independent contractor and not an employee (Hernandez v Chefs Diet Delivery, LLC, 81 AD3d 596 [2d Dept 2011]; see generally Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]; Leon v Martinez, 84 NY2d 83, 87-88 [1994]; Paramount Transp. Sys., Inc. v Lasertone Corp., 76 AD3d 519, 520 [2010]).
Accordingly, the motion for summary judgment is denied.